[727 NYS2d 393]

STEADFAST INSURANCE COMPANY, Appellant, v SENTINEL REAL ESTATE CORPORATION et al., Respondents, et al., Defendant. (And a Third-Party Action.)

First Department, June 7, 2001

## APPEARANCES OF COUNSEL

*Ignatius John Melito* of counsel, New York City (*Steven I. Lewbel* on the brief; *Melito & Adolfsen, P. C.,* attorneys), for appellant.

*Peter A. Cross* of counsel, New York City (*Catherine A. McCann* on the brief; *Jacob, Medinger & Finnegan, L. L. P.,* attorneys), for respondents.

## OPINION OF THE COURT

ANDRIAS, J.

Defendants Sentinel and Meadow Wood L.P. (hereinafter referred to collectively as Sentinel) were covered, as here relevant, as the named insured and as an additional insured, respectively, under Commercial General Liability Policy No. SCO838522900 (the Policy) issued by Steadfast Insurance (Steadfast). The per-occurrence limit of commercial general liability coverage under the Policy was $1 million, with self-insured retentions (SIR) of $25,000 per claimant, $200,000 per occurrence, and $1 million in aggregate. Sentinel engaged

Scibal Associates, Inc. (Scibal) as claims administrator to handle claims against Sentinel within the SIR under the Policy and to deal with Steadfast and other excess carriers on Sentinel's behalf.

On March 4, 1996, a certain woman named Romer, who then resided in an apartment in the Meadow Wood apartment complex in Reno, Nevada, leased to her fiancé, was sexually assaulted and otherwise physically harmed in the apartment by an unknown intruder. The next day, by letter dated March 5, 1996, George Buckle, Sentinel's Director of Insurance and Risk Management, advised Scibal of the occurrence of the incident (field reports of which were attached), directed Scibal to set a $3,500 defense reserve, and noted that "due to the nature of the allegations, a report should be sent to Steadfast Insurance Co." By letter dated March 6, 1996, Scibal acknowledged receipt of Sentinel's letter.

In August 1996, Ms. Romer commenced a personal injury suit in Nevada state court against Meadow Wood L.P., *inter alia*, and named Sentinel as an additional defendant. At such time, Sentinel received a copy of the initial summons and complaint in the Romer action, and forwarded those papers to Scibal under Mr. Buckle's cover letter dated August 20, 1996, in which he requested that Scibal, *inter alia*: "Increase the reserve to $25,000 and alert Steadfast." Mr. Buckle confirmed at his deposition that by "alert Steadfast," he meant that "[t]his claim should be reported immediately to Steadfast Insurance Company." Robert McLaughlin, the Scibal executive with responsibility for the Romer claim, testified that he so understood the August 20th letter. Thereafter, Sentinel received Romer's first amended complaint in October 1996 and her third amended complaint in January 1997 (the second amended complaint is not part of the record).

Neither Sentinel nor Scibal sent Steadfast any notice specifically addressing the Romer claim (apart from monthly "loss run" computer printouts that listed the Romer claim, among hundreds of others) until June 1997—about 15 months after the incident occurred, and about 10 months after the Romer action was commenced. Mr. Buckle of Sentinel sent Scibal a memorandum, dated June 18, 1997, stating that "our records do not reflect who at Steadfast is handling this case," and requesting that Scibal "contact Steadfast, and advise them of our intent to associate [a named attorney] to consult on this case." Thereafter, Mr. McLaughlin of Scibal sent Steadfast a letter dated June 26, 1997, advising Steadfast of the Romer

claim and the Romer action and transmitting the relevant file materials. The letter states, *inter alia*:

> "This file had fallen through a crack and was mistakenly not reported when the law suit was served upon our insured [sic]. We make special exceptions [sic] and apologize accordingly."

Mr. McLaughlin sent Steadfast a follow-up facsimile, dated July 2, 1997, transmitting "additional defense attorney reports relative to our initial notice of 6/26/97." By letter to Sentinel dated July 24, 1997, Steadfast disclaimed coverage on the ground that the Policy conditions that the insurer be given notice of the occurrence within 15 days or as soon as reasonably practicable thereafter (part IV, § 3 [a]) and that all legal process be "immediately" forwarded to the insurer (part IV, § 3 [b]) had not been satisfied. The disclaimer letter noted that "[t]his claim was not tendered to Steadfast until June 1997."

After receiving Steadfast's disclaimer, Mr. Buckle of Sentinel sent David Scibal, Scibal's president and CEO, a letter dated July 28, 1997, advising Scibal to alert its errors and omissions (E&O) carrier of a potential claim by Sentinel against Scibal, noting that Sentinel intended to file a declaratory judgment action contesting Steadfast's disclaimer, and further noting that Sentinel would look to Scibal "to cover the costs of the proposed litigation [against Steadfast]" and "for defense and indemnification should our efforts fail to change the position of Steadfast Insurance Company." Thereafter, Mr. Scibal sent a letter to Scibal's E&O carrier, dated July 29, 1997, copied to Sentinel, alerting Scibal's carrier to Sentinel's potential claim. Among other things, Scibal's July 29, 1997 letter states:

> "Our branch manager in our Florida operation [where Sentinel was serviced], Robert McLaughlin, has advised that they failed to put Steadfast Insurance Company on notice subject to the policy guidelines as submitted herein. As a result, Steadfast has declined coverage to our customer, Sentinel * * *.
>
> "A review of the file clearly indicates that we did not prejudice Steadfast's position, but we also did not report the claim timely pursuant to the policy guidelines."

Subsequent letters from Sentinel's counsel to Scibal's E&O carrier and from Sentinel to Scibal reiterate the position Sentinel took vis-à-vis Scibal and Scibal's insurer (but not in

this action) that Steadfast's disclaimer of coverage as to the Romer claim resulted entirely from Scibal's negligent failure to timely send Steadfast notice of the Romer claim and copies of the pleadings in the Romer action.

In this action, Sentinel has taken the position that Steadfast received the required notice of the Romer claim and litigation through monthly "loss run reports" for Sentinel. According to affidavits of Mr. Buckle and Mr. Scibal, Scibal sent these reports to Steadfast's office in Schaumburg, Illinois, among other locations, pursuant to Endorsement No. 4 to the Policy.[1] Such loss run reports, which were computer printouts listing all open claims against Sentinel (including those falling entirely within the per-claimant SIR) as admitted by Sentinel, were used by the underwriter (again, this function was performed for Steadfast by Glendale Specialty Risks, a separate entity located in California) to monitor the exhaustion of Sentinel's $1 million aggregate SIR under the Policy.

The earliest loss run report that refers to the Romer claim is the one for the period ended March 31, 1996, which was printed on April 5, 1996. The brief reference in the report to the Romer claim incorrectly identified the claimant as Royal Prince, Romer's fiancé and the lessee of the apartment, describes the underlying occurrence as "female roomate [sic] sexually asslt," the state (NV) and date (3/4/96) and tersely sets forth the claim's litigation status and reserve information. Nothing in the report states that such claim, or any of the hundreds of other claims listed, was being tendered to Steadfast. Although a portion of the report (entitled "Claims Management Exception Report") sets forth a list of "New Claims," including the Romer claim, Mr. Scibal testified at his deposition that Steadfast (unlike Glendale, the underwriter in California) did not receive the "Claims Management Exception Report" as of April 30, 1996.

Ms. Romer settled her lawsuit in January 1998, in consideration of a payment of $750,000 received from Sentinel. The funds Sentinel used to settle the Romer action, as well as the funds used to litigate the Romer action and the instant declaratory judgment action, were loaned to Sentinel by Scibal's E&O carrier, Gulf Insurance Company, which loan is repayable only to the extent Sentinel obtains a recovery against Steadfast on Sentinel's claim under the Policy. In connection with that loan,

---

1. Although Endorsement No. 4 required only quarterly reports, Scibal evidently sent out a report each month.

Sentinel settled its claims against Scibal, and tendered to Gulf control of Sentinel's prosecution of this action and the prosecution of its counterclaims against Steadfast.

Steadfast commenced this action in September 1997, seeking a declaration that it is not obligated to defend or indemnify Sentinel in connection with the Romer claim based on Sentinel's failure to give timely notice and to immediately forward copies of the Romer action pleadings. The basis for bringing the action in New York is the fact that Sentinel is incorporated, and has its principal place of business, in this state. Sentinel's answer asserts a counterclaim for a declaration that it is entitled to such defense and indemnity from Steadfast, and for $1 million in damages alleged (without specificity) to have been caused by Steadfast's purportedly improper disclaimer. (Sentinel also commenced a third-party action against its excess carrier, Federal Insurance Company, which third-party action has been settled and thus is not at issue on this appeal.)

After discovery was completed, Steadfast moved for summary judgment in its favor in September 1999. In opposing the motion, Sentinel took the position (in the affidavit of Mr. Buckle, its risk manager), in substance, that Endorsement No. 4 to the Policy superseded the notice conditions of the pre-printed form with which Sentinel failed to comply (part IV, § 3 [a], [b]. According to Mr. Buckle, "[t]he terms of the Steadfast Policy which I negotiated [i.e., Endorsement No. 4] did not even require Sentinel, through Scibal, to give notice to Steadfast of a claim until the amount of the reserve reached $12,500 or suit was filed, whichever came first." Similarly, Mr. Scibal stated in his affidavit:

> "[Steadfast] has never accepted tender of a claim from Scibal or from Sentinel until such time as the SIR level noted in the policy at issue is reached. As such, and with respect to the Romer claim, I was not concerned about the fact that our records did not confirm that a notice letter of loss went out to Steadfast concerning this claim because, based on our prior practice with Steadfast, they never became involved in any claim, never wanted to hear about a claim, and never participated in a claim until such time as the SIR was at the level required by the policy, or the claim was in litigation and required authority for a settlement conference."

Sentinel and Scibal did not, however, identify any claim for

which Steadfast ultimately took responsibility where Sentinel had failed to comply with part IV, section 3 (a) and (b), of the Policy. Sentinel also took the position that, to the extent the notice conditions had not been superseded by the endorsement, the monthly loss run reports were sufficient to satisfy such conditions.

In denying summary judgment to Steadfast, the IAS court found that the adequacy and timeliness of Sentinel's notice of the underlying personal injury claim are factual issues which cannot be resolved on papers.

■■ In brief, however, it is plain that: Endorsement No. 4 to the Policy did not supersede, but constituted an addition to, the notice conditions with which Sentinel failed to comply; the loss run report did not satisfy the condition that Steadfast be given notice of the occurrence within 15 days or as soon as reasonably practicable thereafter (part IV, § 3 [a]); and the denial of coverage is independently justified by Sentinel's additional failure to forward to Steadfast copies of the pleadings in the Romer action "immediately" after Sentinel received them (part IV, § 3 [b]). Sentinel's separate argument, not addressed by the motion court, that this case calls for application of California or Illinois law, which would apparently require the insurer to show that it was prejudiced by the failure to comply with the notice conditions, is also unavailing, given that the Policy was issued to a New York named insured.

■ Under New York law, an insurer need not demonstrate that it has been prejudiced by the insured's failure to comply with the policy's notice conditions in order to disclaim coverage based on such noncompliance (the "no prejudice" rule) (*Security Mut. Ins. Co. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 440). Given the nationwide scope of Sentinel's operations, the principal location of the insured risk should be deemed to be the state where Sentinel is incorporated and has its principal place of business, from which it negotiated the special terms of the Policy, and where the Policy presumably was delivered to it (thus constituting the state where the contract was made).

■ As to Sentinel's argument that Endorsement No. 4 to the Policy supersedes the notice conditions of the pre-printed policy form with which Sentinel allegedly failed to comply, such argument is entirely without merit. Endorsement No. 4 expressly provides that the notice conditions "shall be amended by the *addition* of new paragraph (e)" set forth in the endorsement (emphasis added). Thus, the endorsement, by its terms, purports only to add to, not to supersede, the notice require-

ments that would exist in its absence. Where an endorsement to the Policy was intended to supersede a provision of the pre-printed policy form, the endorsement expressly provides that the relevant provision "is deleted and replaced by the following."

While it could be argued that, to the extent there is any unavoidable conflict between the terms of Endorsement No. 4 and the terms of the pre-printed form, the terms of the specially negotiated endorsement should control, the rule is that " 'where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect' " (*Bijan Designer For Men v Fireman's Fund Ins. Co.*, 264 AD2d 48, 53, quoting *Proyecfin de Venezuela v Banco Indus.*, 760 F2d 390, 395-396). Here, the notice conditions of the pre-printed policy form and the terms of Endorsement No. 4 are easily reconciled. Specifically, the endorsement should be construed to require Sentinel to give Steadfast specified information, whether or not such information relates to a claim that is entirely within Sentinel's SIR, or is otherwise outside the scope of coverage under the Policy. For example, the endorsement expressly requires that Steadfast be given notice of certain categories of claims (e.g., involving death, brain damage, and other serious injuries) "even if not covered under this policy." Moreover, the periodic loss run reports that were sent to Steadfast pursuant to the endorsement included, by Sentinel's own admission, each and every open claim against Sentinel, no matter how small, thus including numerous claims entirely within its SIR. Sentinel's position that Endorsement No. 4 supersedes the pre-printed notice conditions is further undercut by the fact that the endorsement does not set forth any time frame within which the notices it requires must be given.

In view of the express and unambiguous terms of the Policy requiring Sentinel, as a condition precedent to Steadfast's coverage obligation, to give the insurer notice of any occurrence within 15 days of learning about it, "or as soon as is reasonably practicable thereafter," the lengthy discussions in Sentinel's brief of the purported "course of dealing" under the Policy—under which the notice conditions purportedly were dispensed with or deemed to be satisfied by the monthly loss

run reports—are entirely irrelevant.[2] Sentinel, as noted previously, does not cite a single instance in which Steadfast accepted tender of a claim in spite of a failure by Sentinel to comply with the Policy's notice conditions, or based solely on "notice" contained in a monthly loss run report. Moreover, the contemporaneous correspondence among Sentinel, Scibal and Steadfast concerning the Romer claim appears to establish that Sentinel and Scibal both understood that the Policy required that Steadfast be given specific notice of the particular occurrence and of the commencement of litigation in accordance with part IV, § 3 (a) and (b), of the Policy. That Steadfast allegedly did not choose to become actively involved in claims until they approached the SIR limit cannot, without more, estop it from disclaiming coverage based on Sentinel's noncompliance with the Policy's express notice conditions.

Sentinel argues that, to the extent it was required to comply with the Policy's notice conditions, the Policy does not specify the form which notice must take (other than that it be written), and that, therefore, at least a triable issue exists as to whether the monthly loss run reports, which reported the Romer claim among hundreds of others, fulfilled the Policy's notice condition. Again, Mr. Scibal, the CEO of Sentinel's claim administrator, alleges that the loss run reports were sent to Steadfast's Schaumburg, Illinois office during the relevant period, an argument apparently accepted by the motion court.

Although the parties have not cited any New York authority directly on point, Steadfast cites a number of decisions from other jurisdictions which have rejected arguments similar to Sentinel's, seeking to have a reference to a claim in material submitted for purposes other than claims handling deemed to constitute compliance with the policy's notice conditions.[3] Sentinel's effort to distinguish these cases on the ground that

**2.** Also irrelevant is Sentinel's alleged confusion as to where notices to Steadfast should have been sent, since it is undisputed that no timely notice of the Romer claim was sent at all, to any address.

**3.** *W.R. Grace & Co. v Maryland Cas. Co.*, 33 Mass App Ct 358, 368-369, 600 NE2d 176, 182, *review denied* 413 Mass 1109, 604 NE2d 35 (1992) (reference to claim in list of underwriting data submitted for purposes of renewing policy did not constitute notice of claim required by policy); *National Union Fire Ins. Co. v Baker & McKenzie*, 997 F2d 305, 309 (7th Cir 1993) (insurer is not required to collate documents from different sources to determine whether it has received notice of a claim; "It is far easier for the insured to lick a postage stamp"); *American Cas. Co. v Continisio*, 17 F3d 62, 69 (3d Cir 1994) (insurer need not "sift through a renewal application and decide what should be forwarded to the claims department on the insured's behalf"); *Federal Deposit Ins. Corp. v St. Paul Fire & Mar. Ins. Co.*, 993 F2d 155, 160 (8th Cir

the loss run reports here at issue were not part of a renewal application is not persuasive, since the undisputed fact remains that such reports were not used for purposes of claims handling. Nor does Sentinel cite authority supporting its view that the insurer's receipt of a long list of claims—both tendered and non-tendered, covered and non-covered—submitted for purposes other than claims handling, should be deemed to satisfy the notice condition to coverage of a specific claim listed therein.

Even if it is assumed that the loss run report contained sufficient information about the claim to comply with the Policy's notice condition, the fact that the report lists hundreds of claims, most of which were not going to reach the SIR limit and, therefore, would never become the insurer's responsibility, makes the report entirely unsuitable to be deemed to satisfy the notice condition. The report did not designate which claims Sentinel eventually intended to tender to Steadfast. Adoption of Sentinel's theory would require Steadfast to go through each loss run report and to look for claims for which no prior notice had been received, and to determine, for each of those claims, whether it merited further investigation. (In this connection, it is noted that the reserve stated for the Romer claim in the first loss run report referring to it is $4,300, well within the SIR.) The insurer should not be required to go through such a time-consuming procedure, rather than requiring the insured simply to comply with the Policy's rather straightforward notice requirement—which Sentinel or its agent, Scibal, easily could have done, given that Sentinel gave Scibal notice of the incident one day after it occurred, and therein specifically directed Scibal to send a report to Steadfast.

Even if the loss run report could be deemed to otherwise satisfy the Policy's notice conditions, it was untimely. The earliest report referring to the Romer incident was printed on April 5, 1996, and thus would have been received by Steadfast at least one month after Sentinel learned of the incident on March 5, 1996 (if not the day before). The Policy requires that notice be given "within fifteen (15) days [after the insured learns of the incident] or as soon as is reasonably practicable thereafter." Here, Sentinel gave Scibal written notice of the incident on the day after it occurred, and nothing made it "[im]practicable" to give Steadfast notice prior to the expiration of the

---

1993) ("Notice that would cause one to investigate a renewal for insurance must surely be different than notice to investigate potential claims under a 'claims made' policy").

15-day period thereafter. It should also be noted that, given the gravity of Ms. Romer's allegations, it would have been apparent to Sentinel and Scibal from the outset that the potential exposure arising from her claim exceeded the $25,000 SIR.

Finally, independent of the requirement of part IV, section 3 (a) of the Policy that the insurer be given prompt notice of an occurrence that may give rise to a claim, the Policy provision immediately following (part IV, § 3 [b]) requires that the insured "immediately forward" to the insurer "every demand, notice, summons or other process received" by the insured. It is undisputed that, notwithstanding this condition precedent to coverage, no papers from the Romer action were forwarded to Steadfast until June 1997, approximately 10 months after the action was commenced in August 1996.

Thus, even if the loss run report could be deemed to satisfy the notice of occurrence condition, Sentinel's failure to comply with the condition that the Romer action papers be "immediately forward[ed]" independently justifies Steadfast's denial of coverage. As this Court has recently held, even if a question of fact existed as to whether an insured complied with its obligation to give notice of a suit "as soon as practicable," the failure to comply with the obligation to "immediately send [the insurer] copies of any legal papers received," for which no valid reason was given, independently absolved the insurer of its coverage obligations (*Viles Contr. Corp. v Hartford Fire Ins. Co.*, 271 AD2d 349).

Accordingly, the order of the Supreme Court, New York County (Harold Tompkins, J.), entered May 17, 2000, which denied plaintiff Steadfast's motion for summary judgment, should be reversed, on the law, with costs, the motion granted and it is declared that Steadfast has no obligation under the subject commercial liability policy to defend and indemnify defendants-respondents with respect to the underlying personal injury action brought against them in Nevada by Romer.

Tom, J. P., Ellerin, Rubin and Saxe, JJ., concur.

Order, Supreme Court, New York County, entered May 17, 2000, reversed, on the law, with costs, plaintiff's motion for summary judgment granted and it is declared that plaintiff has no obligation under the subject commercial liability policy to defend and indemnify respondents with respect to the underlying personal injury action.