[822 NYS2d 30]

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, et al., Plaintiffs, v FOSTER WHEELER CORPORATION, Appellant, and AFFILIATED FM INSURANCE COMPANY et al., Respondents, et al., Defendants, et al., Nominal Defendants.

First Department, September 28, 2006

## APPEARANCES OF COUNSEL

*Covington & Burling*, Washington, DC (*Robert A. Long, Jr.*, of the District of Columbia bar, admitted pro hac vice, and *William P. Skinner* and *Keith A. Noreika* of counsel), and *Covington & Burling*, New York City (*Michael C. Nicholson* of counsel), for appellant.

*Crowell & Moring LLP*, Washington, DC (*Clifton S. Elgarten, Kathryn A. Underhill, Jonathan H. Pittman* and *Amy B. Newman* of counsel), and *Levin & Glasser, P.C.*, New York City (*Paul G. Burns* of counsel), for Century Indemnity Company, respondent.

*Cozen O'Connor*, New York City (*James B. Dolan, Jr., Thomas G. Wilkinson, Jr.*, and *Melissa F. Brill* of counsel), for AIU Insurance Company, and others, respondents.

*Riker, Danzig, Scherer, Hyland & Perretti LLP*, New York City (*David A. Niles* and *Brian E. O'Donnell* of counsel), for Mitsui Sumitomo Insurance Company, Ltd., and others, respondents.

*Bates & Carey LLP*, Chicago, Illinois (*Krista C. Sorvino* and *Maria G. Enriquez* of counsel), for American Re-Insurance Company and another, respondents.

*Coughlin Duffy, LLP*, Morristown, New Jersey (*Adam M. Smith* of counsel), for Zurich American Insurance Company, respondent.

## OPINION OF THE COURT

FRIEDMAN, J.P.

The question presented is whether New York law or New Jersey law governs a large number of excess liability insurance

policies, under which the insured seeks coverage for a portion of the costs of defending and paying asbestos-related personal injury claims that have been asserted against it since the 1970s. For the reasons discussed below, we conclude that New Jersey law applies.

This declaratory judgment action seeks an apportionment of responsibility for the defense and indemnity costs of hundreds of thousands of asbestos-related personal injury claims (the asbestos claims) among defendant Foster Wheeler Corporation (FW Corp.), its subsidiary, Foster Wheeler Energy Corp. (FW Energy), and their liability insurers. The asbestos claims, which have been asserted in jurisdictions throughout the United States since the 1970s, are based on allegations that the claimants or their decedents were exposed to asbestos contained in boilers and other steam-generating equipment designed and built for industrial customers by FW Corp. (from the early twentieth century until 1973) or by FW Energy (since 1973, when FW Energy took over FW Corp.'s commercial operations). FW Corp. was incorporated under New York law from 1900 until 2001, when it was merged into another entity in a corporate restructuring. FW Energy, which is now a subsidiary of FW Corp.'s successor-by-merger, has been incorporated under Delaware law at all times since its formation in 1973. We use the term "Foster Wheeler" to refer to FW Corp. and FW Energy collectively.

From its founding in 1900 until 1962, Foster Wheeler's principal place of business was located in New York City. From 1962 to the present, Foster Wheeler's principal place of business has been in New Jersey. After the 1962 move to New Jersey, Foster Wheeler continued to maintain a small office in New York City, where only one employee was assigned on a full-time basis. It is undisputed that, at all relevant times, Foster Wheeler's operations relating to the design and building of asbestos-containing products were conducted throughout the United States, and that its customers purchasing such products were similarly widespread.

Before the order appealed from was rendered, Foster Wheeler reached settlements with all of its insurers except for defendants-respondents (the nonsettling insurers). From 1970 to 1981, the nonsettling insurers sold Foster Wheeler certain excess liability policies (the unsettled policies) that covered various periods between February 1, 1970 and October 1, 1982. Thus, all of the unsettled policies were issued while Foster Wheeler's principal place of business was in New Jersey. The

nonsettling insurers (of which there are about 30) had their principal places of business in various states at the times their policies were issued; five were domiciled in New York, three in New Jersey. It is undisputed that almost all of the nonsettling insurers are licensed to do business in both New York and New Jersey.

The parties agree that the underlying asbestos claims are based on injuries that are deemed, for purposes of insurance coverage, to have been suffered continuously over extended periods of time. This makes it necessary to allocate each injury "horizontally" over the period of its occurrence in order to determine the coverage obligation of each nonsettling insurer. The conflict-of-laws issue in this case arises from the circumstance (on which the parties agree, as more fully discussed below) that New York and New Jersey prescribe different mathematical methods of performing such an allocation. The matter is further complicated by the need, once an allocation is made to each year (whichever method is used), to allocate the loss for that particular year "vertically" among the various layers of insurance purchased for that year, with primary policies paying first within each year. Thus, as the nonsettling insurers point out, "the way in which liabilities are allocated to policies in the primary layers will determine when those primary policies are exhausted, and thus when excess layer policies [such as the unsettled policies] are reached, if at all."

Since there is no suggestion that methods of allocating a loss "horizontally" over time can be derived from the terms of the relevant policies, such an allocation method must be supplied by the applicable state law. As the relevant policies do not contain choice-of-law provisions, we are required to make that determination in accordance with our state's established choice-of-law principles.

As previously indicated, the parties agree (and we accept for purposes of this appeal) that New York and New Jersey (the only states suggested as the source of applicable law on the allocation issue) each uses a different mathematical method of effecting a pro rata allocation of an insured loss over the period of its occurrence. The " 'time-on-the-risk' method" that was approved by the New York Court of Appeals in *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.* (98 NY2d 208, 225 [2002]) derives the portion of the total loss allocable to the term of a given policy "by multiplying the [total loss] by a fraction that has as its denominator the entire number of years of the

claimant's injury, and as its numerator the number of years within that period when the policy was in effect" (*Stonewall Ins. Co. v Asbestos Claims Mgt. Corp.*, 73 F3d 1178, 1202 [2d Cir 1995]).[1] The New Jersey Supreme Court, on the other hand, has adopted the method of "proration on the basis of policy limits, multiplied by years of coverage" (*Owens-Illinois, Inc. v United Ins. Co.*, 138 NJ 437, 475, 650 A2d 974, 993 [1994]). Under the New Jersey method (which has been referred to as "time-plus-limits"), the proportion of the total loss allocable to the term of a given policy is the ratio of the total coverage purchased (or risk retained) during the term of that policy to the total coverage purchased (or risk retained) during the entire period of the injury's occurrence (excluding any time during which insurance for the risk was unavailable) (*see Carter-Wallace, Inc. v Admiral Ins. Co.*, 154 NJ 312, 322-323, 712 A2d 1116, 1122 [1998] [illustrating how the method operates]). It is undisputed that the time-plus-limits method, by "intentionally assign[ing] a greater portion of indemnity costs to years in which greater amounts of insurance were purchased" (154 NJ at 326, 712 A2d at 1123 [internal quotation marks and citation omitted]), would make tens of millions of dollars more coverage available to Foster Wheeler than would the time-on-the-risk method.

In the proceedings before the motion court, Foster Wheeler moved for partial summary judgment declaring all disputed issues to be governed by New Jersey law, while the nonsettling insurers moved for partial summary judgment declaring New York law to govern. In the order appealed from, the motion court ruled that New York law applies. We now reverse and hold that New Jersey law applies.

Under New York's "center of gravity" or "grouping of contacts" approach to choice-of-law questions in contract cases, we are required to apply the law of the state with the "most significant relationship to the transaction and the parties" (*Zurich Ins. Co. v Shearson Lehman Hutton*, 84 NY2d 309, 317 [1994], quoting Restatement [Second] of Conflict of Laws [hereinafter, Restatement] § 188 [1]). This approach generally dictates that a contract of liability insurance be governed by the law of "the

---

**1.** Although the Court of Appeals stated that its approval of the time-on-the-risk method in *Consolidated Edison* was "not the last word on proration" (98 NY2d at 225), for purposes of this appeal, we accept the parties' shared premise that *Consolidated Edison* adopted time-on-the-risk as New York's allocation method.

state which the parties understood was to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties" (*id.* at 318, quoting Restatement § 193). However, the location-of-the-risk rule obviously cannot be applied without modification in the event the insurance policies in question cover risks that are spread though multiple states. Such is the case here, where the risks covered by the unsettled policies are nationwide or global in scope, and, given Foster Wheeler's widely dispersed operations and customers, there is no contention that, at the time the unsettled policies were issued, the parties would have understood any one state to have constituted, in a literal sense, "the principal location of the insured risk." Accordingly, we turn to broader choice-of-law principles for guidance.

In adopting the "grouping of contacts" theory to resolve choice-of-law issues in contract cases, the Court of Appeals noted that the merit of this approach "is that it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation" (*Auten v Auten*, 308 NY 155, 161 [1954] [internal quotation marks, brackets and citation omitted]). Thus, although contract cases do not call for use of the pure "interest analysis" employed in tort cases (*see Zurich*, 84 NY2d at 319), the respective "governmental interests" of the competing jurisdictions nonetheless "should be considered" (*Zurich*, 84 NY2d at 319, quoting *Matter of Allstate Ins. Co. [Stolarz—New Jersey Mfrs. Ins. Co.]*, 81 NY2d 219, 226 [1993]).

The governmental interests implicated by an insured's claim against an insurer of risks located in multiple states are those in: (1) regulating conduct with respect to insured risks within the state's borders; (2) assuring that the state's domiciliaries are fairly treated by their insurers; (3) assuring that insurance is available to the state's domiciliaries from companies located both within and without the state; and (4) regulating the conduct of insurance companies doing business within the state's borders (*see Fireman's Fund Ins. Co., Inc. v Schuster Films, Inc.*, 811 F Supp 978, 984 [SD NY 1993] [applying New York choice-of-law principles]). In the case of a corporate insured seeking coverage under a policy covering risks in multiple states, the foregoing interests, in aggregate, weigh in favor of applying

the law of the insured's domicile, notwithstanding that certain other states (e.g., the states of the insurer's domicile, and where negotiation and contracting occurred) may share, to a lesser extent, in the fourth interest enumerated above (see id. at 984-985).[2]

Additional goals of choice-of-law analysis are "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied" (Restatement § 6 [2] [f], [g]; see Zurich, 84 NY2d at 318 n 5 ["Section 6 of (the) Restatement . . . embodies the general choice of law principles"]). These goals, too, will be furthered by applying the law of the insured's domicile to liability insurance policies covering multistate risks. The state of the insured's domicile is a fact known to the parties at the time of contracting, and (in the absence of a contractual choice-of-law provision) application of the law of that state is most likely to conform to their expectations. As a Rhode Island federal court addressing a similar choice-of-law issue has observed, "common sense suggests that, knowing of the potential for claims in any number of states and even in foreign countries, the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together" (CPC Intl., Inc. v Northbrook Excess & Surplus Ins. Co., 739 F Supp 710, 715 [D RI 1990], reconsideration granted on other grounds 839 F Supp 124 [D RI 1993], affd 46 F3d 1211 [1st Cir 1995]; accord Liggett Group Inc. v Affiliated FM Ins. Co., 788 A2d 134, 138 [Del Super 2001]). Moreover, the state of the insured's domicile can be ascertained in any subsequent litigation without fact-intensive inquiry or unguided weighing of different contacts, and making the insured's domicile the primary factor in selecting applicable law minimizes the likelihood that contemporaneous policies will be deemed governed by the laws of different states. Thus, in addition to rendering the resolution of choice-of-law issues less difficult, adoption of a rule to apply the law of the insured's dom-

---

2. The nonsettling insurers, citing Stolarz (81 NY2d at 226), argue that New York, as the center of the worldwide insurance industry, has an interest in the issues in dispute, given that the insurance brokers that procured the unsettled policies were located in New York, as more fully discussed below. We acknowledge, of course, that the Court of Appeals has recognized New York's interest in "maintain[ing] its position as a financial capital of the world" (id.). While this interest might well warrant applying New York law to determine the authority of the New York-based brokers that procured the policies, we are not persuaded that the involvement of New York brokers gives New York a greater interest than the state of the insured's domicile in the construction of the policies themselves.

icile makes it more likely that consistent and uniform results will be reached in different cases.

What emerges from the foregoing is that, where it is necessary to determine the law governing a liability insurance policy covering risks in multiple states, the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk. As such, the state of domicile is the source of applicable law. This conclusion accords with prior decisions of this Court and of the Third Department. Most recently, in *Steadfast Ins. Co. v Sentinel Real Estate Corp.* (283 AD2d 44 [2001]), this Court held that, where the policy in question covered the risks arising from "the nationwide scope of [the insured's] operations, the principal location of the insured risk should be deemed to be the state where [the insured] is incorporated and has its principal place of business" (*id.* at 50), i.e, the insured's domicile.[3] Similarly, in *Munzer v St. Paul Fire & Mar. Ins. Co.* (203 AD2d 770 [1994]), the Third Department held that the "primary factor" in ascertaining the law governing a liability policy covering risks in multiple states was that the insured was "a Vermont based business" (*id.* at 772), notwithstanding that, among other things, the policy had been procured by a New York broker from the insurer's New York office (*id.* at 771).[4] Finally, in *Regional Import & Export Trucking Co. v North Riv. Ins. Co.* (149 AD2d 361 [1989]), this Court held that "a policy delivered to a New Jersey corporation to insure against a loss occurring 'anywhere' should be subject to the law of that State" (*id.* at 362).

The foregoing establishes that, "where the insured risk is scattered throughout multiple states, courts still deem the risk to be located principally in one state" (*Maryland Cas. Co. v Continental Cas. Co.*, 332 F3d 145, 153 [2d Cir 2003] [following *Steadfast*]), namely, in the state of the insured's domicile at the time the policy was issued. It remains for us to discuss whether

---

**3.** We also noted in our discussion of the choice-of-law issue in *Steadfast* that the insured's domicile in that case was also the place "from which it negotiated the special terms of the Policy, and where the Policy presumably was delivered to it (thus constituting the state where the contract was made)" (283 AD2d at 50). While these factors provided additional support for the choice-of-law ruling in *Steadfast*, for the reasons discussed below, they were not essential to that ruling.

**4.** As more fully discussed below, *Munzer*'s holding that the law of the state of the insured's principal place of business should be applied if that state is different from the insured's state of incorporation (203 AD2d at 771, 772) is also of significance to this appeal.

a corporate insured's domicile is the state of its principal place of business or the state of its incorporation, where, as here, these are not the same state.[5] In the case of such a divergence, the state of the principal place of business takes precedence over the state of incorporation, a point that the nonsettling insurers apparently do not dispute (*see Munzer*, 203 AD2d at 771, 772 [applying the law of Vermont, the state of the insured's principal place of business, rather than the law of New York, the state of incorporation]). Treating the state of the principal place of business as the corporate domicile for these purposes, rather than the state of incorporation, is consistent with the view expressed in the Restatement that, "[a]t least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation" (Restatement § 188, Comment *e*, at 581). We look to the state of incorporation for the law governing the corporation's internal corporate governance and its relations with shareholders, not for the law governing the corporation's contractual relationships in general.

Significantly, our conclusion that New Jersey law applies to the unsettled policies finds further support in the fact that Foster Wheeler, as an insured with a New Jersey principal place of business, will look to the New Jersey insurance guaranty fund for payment of its claims against insolvent insurers (*see* NJ Stat Ann § 17:30A-5; *see also American Employers' Ins. Co. v Elf Atochem N. Am., Inc.*, 157 NJ 580, 591, 725 A2d 1093, 1099 [1999]; *Eastern Seaboard Pile Driving Corp. v New Jersey Prop.-Liab. Ins. Guar. Assn.*, 175 NJ Super 589, 594, 421 A2d 597, 600 [App Div 1980]). New Jersey's provision of such protection to Foster Wheeler, based on Foster Wheeler's maintenance of its principal place of business in that state, confirms that New Jersey now has, and had at the time the unsettled policies were issued, the greatest interest in the determination of the amount of coverage available to Foster Wheeler.

We recognize that, in contract cases generally, the resolution of a choice-of-law issue involves consideration of five factors enumerated in section 188 of the Restatement (the Restatement factors), viz., the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and

---

**5.** As previously noted, throughout the period in which the unsettled policies were issued (1970-1981), the principal place of business of Foster Wheeler (meaning both FW Corp. and FW Energy) was in New Jersey, while FW Corp. and FW Energy were incorporated, respectively, in New York and Delaware.

the contracting parties' domiciles (see Zurich, 84 NY2d at 317, citing Restatement § 188 [2]). In arguing for the application of New York law, the nonsettling insurers rely heavily on the first three of these factors, emphasizing the role New York City insurance brokerage firms (specifically, Marsh & McLennan and Johnson & Higgins) played in procuring the unsettled policies. In this regard, the nonsettling insurers point to evidence that, among other things: (1) the unsettled policies were generally negotiated and "bound" by these brokers in New York City; (2) many of the unsettled policies were countersigned by the insurers' agents in New York; (3) the insurers generally delivered the policies to the brokers' New York offices; (4) premium invoices were sent by the insurers to, and premium checks remitted to the insurers from, the brokers' offices; and (5) most of Foster Wheeler's premium checks were drawn on a bank account it maintained in New York City. Based on this evidence, the nonsettling insurers argue that New York was the place where the unsettled policies were contracted, negotiated and performed.[6]

Foster Wheeler, for its part, argues that New Jersey was the place of contracting, negotiation and performance for each of the unsettled policies. To this end, Foster Wheeler highlights evidence that, among other things: (1) each of the unsettled policies was either mailed or hand-delivered to Foster Wheeler in New Jersey; (2) Foster Wheeler's internal activities related to obtaining the policies (e.g., setting specifications, preparing applications, giving brokers authority to act, writing premium checks) were performed in New Jersey; (3) the brokers frequently met with Foster Wheeler in New Jersey; and (4) Foster Wheeler received premium invoices in New Jersey.[7]

As previously discussed, in cases involving liability insurance covering multistate risks, we regard the state of the insured's

---

**6.** The nonsettling insurers apparently use the term "performance" to refer only to the insured's payment of the premium. This ignores the fact that the insurer's payment of a claim (which has not yet occurred with regard to any of the unsettled policies) also constitutes the performance of a policy obligation.

**7.** Foster Wheeler apparently concedes that it generally remitted premium checks to, and received policies and premium invoices from, the brokers' New York offices. Foster Wheeler argues that this should not affect the choice-of-law analysis because (according to Foster Wheeler) the brokers, in transmitting such material between the parties, were acting as agents of the insurers. Not surprisingly, the nonsettling insurers argue that the brokers were acting as agents of Foster Wheeler. For the reasons discussed below, we find it unnecessary to determine which party the brokers were representing in performing these functions.

domicile to be a proxy for the principal location of the insured risk, which, under New York law and Restatement § 193, is the controlling factor in determining the law applicable to a liability insurance policy, thereby obviating the need to consider all five Restatement factors. Even if consideration of all five Restatement factors were required, however, we still would conclude that New Jersey law should be applied. Further, we would reach the same conclusion even if, as the nonsettling insurers argue, New York constituted the place of contracting, negotiation, and the insured's performance. This is because the Restatement factors "are to be evaluated according to their relative importance with respect to the particular issue" (Restatement § 188 [2]). Stated otherwise, the choice-of-law analysis is not "a mindless scavenger hunt to see which state can be found to have more contacts, but rather . . . an effort to detect and analyze what interest the competing states have in enforcing their respective rules" (*Fireman's Fund*, 811 F Supp at 984). In the case of a liability insurance policy covering risks in multiple states, the state of the insured's principal place of business has a greater concern with issues of policy construction and application bearing on the amount of available coverage than do the states where contracting, negotiation, or payment of the premium happened to occur.

In this case, the nonsettling insurers' argument that the first three Restatement factors point to New York (which the motion court essentially adopted) is based largely on the fact that the unsettled policies were procured by New York-based insurance brokers. As a result of the brokers' involvement, certain of the relevant activities (negotiations, policy delivery, premium collection) occurred in New York. We agree with Foster Wheeler that the nonsettling insurers' approach places too much weight on the location of the broker, who, after all, is not a party to the insurance contract (*see Munzer*, 203 AD2d at 771 [applying the law of Vermont, the state of the policyholder's principal place of business, although the "policies were procured through a New York insurance broker from (the insurer's) New York office"]; *Regional Import & Export*, 149 AD2d at 362 ["(t)he mere fact that the policy was placed through a New York insurance broker which negotiated its terms is not a sufficient contact" to warrant application of New York law, given the insured's New Jersey domicile]; *see also CPC Intl.*, 739 F Supp at 712 ["the locations of the brokers present mere distractions because the brokers acted only as intermediaries"]; *Liggett Group*, 788 A2d

at 141 [in choice-of-law analysis, roles of brokers "pale in comparison and significance to the role of the insured" (internal quotation marks, brackets, ellipsis and citation omitted)]).[8] Thus, when the Restatement factors are "evaluated according to their relative importance with respect to the particular issue [presented in this case]" (Restatement § 188 [2]), the conclusion is that the insured's principal place of business should be considered the "primary factor" (*Munzer*, 203 AD2d at 772) in the choice-of-law analysis.

In the alternative, the nonsettling insurers argue that, even assuming that the insured's primary place of business is the primary factor in resolving the choice-of-law issue presented here (as we now hold), the law governing the unsettled policies cannot be chosen without also considering the settled policies, as well as still earlier lost policies that the nonsettling insurers also consider relevant.[9] Many of the settled policies, and all of the lost policies, were issued before 1962, when Foster Wheeler's principal place of business was still in New York. Since these pre-1962 settled and lost policies presumably would have been deemed governed by New York law, the nonsettling insurers contend, considering each policy separately for choice-of-law purposes would result in "applying differing allocation approaches to the same sequence of policies." This, they maintain, "would add insurmountable complexity if not impossibility to the process, undermining the basic principles underlying allocation," which they describe as "divid[ing] responsibility for a continuing liability in a consistent and coordinated way." Accordingly, the nonsettling insurers reason, there should be a blanket choice-of-law determination for all policies covering the asbestos claims, whether issued before or after Foster Wheeler's 1962 move to New Jersey, and whether settled, unsettled, or lost. In their view, the law chosen to govern all implicated policies should be that of New York, on the ground that, even if the insured's principal place of business is the primary factor in choosing the governing law, Foster Wheeler had its principal

---

8. To the extent the nonsettling insurers rely on the fact that most premium checks were drawn on Foster Wheeler's New York bank account, we fail to see how the bank's location would give New York an interest in the construction of the insurance policies for which the checks constituted payment.

9. Foster Wheeler denies the relevance of the lost policies. We do not find it necessary to determine whether the lost policies are relevant in order to decide this appeal.

place of business in New York for the majority of the years the nonsettling insurers regard as relevant (1940 to 1982).[10]

The crux of the nonsettling insurers' concern is that, in determining when their excess layers of coverage are reached, the losses will be allocated to the now-settled primary policies (and lower-level excess policies) in force during the same years (1970 to 1982) in accordance with a state law different from that applicable to the unsettled policies themselves. Specifically, the nonsettling insurers are concerned that the losses will be allocated in accordance with New York law to the policies issued by settled defendant Liberty Mutual Insurance Company (Liberty), which provided underlying primary coverage for all but three years (1972-1975) of the decades of the injuries' occurrence, at the same time that New Jersey law is applied to the unsettled policies.[11] As previously noted, the nonsettling insurers contend that Foster Wheeler was based in New York for most of what they view as the relevant period, and contend, on that basis, that New York law is applicable to the Liberty policies, whenever issued. As also previously discussed, New York law spreads the loss evenly over the entire period of loss occurrence, while New Jersey law shifts more of the loss to periods when more coverage was purchased, i.e., the later years, when the unsettled policies were in force. Therefore, applying New York law to the settled policies underlying the unsettled policies, while applying New Jersey law to the unsettled policies, will result in simultaneously reaching the unsettled policies earlier (through smaller allocations to the lower-level policies) and allocating more of the loss to the unsettled policies.

We are not persuaded by the nonsettling insurers' contention that all of the settled policies (and the lost policies, assuming

---

**10.** The parties disagree on how far back in time the relevant policies extend. Foster Wheeler contends that the relevant policies extend back to around 1952, while the nonsettling insurers contend that the relevant policies extend back at least to 1940. This dispute cannot be resolved on the present record; in any event, the instant appeal does not require us to resolve it. Assuming, however, that the nonsettling insurers are correct that the relevant years are from 1940 to 1982, Foster Wheeler points out that, during this 42-year period, it purchased 82.7% of its liability insurance policies, and 95% of its total liability coverage, while based in New Jersey, i.e., after 1962.

**11.** Contrary to the nonsettling insurers' claim that Foster Wheeler has attempted to manipulate the choice-of-law determination by selectively settling with certain insurers rather than others, the record establishes that Liberty, as well as Hartford Accident & Indemnity Company, the primary insurer during Liberty's three-year hiatus, both argued for application of New Jersey law before they settled with Foster Wheeler.

their relevance) must be considered in determining which state's law governs the unsettled policies. Under our choice-of-law analysis, the settled primary and lower-level excess policies underlying the unsettled policies in force from 1970 to 1982 will also be deemed governed by New Jersey law, for the simple reason that all such underlying policies were, like the unsettled policies, issued while Foster Wheeler was based in New Jersey. The pre-1962 settled policies do not underlie the unsettled policies that cover the years 1970 to 1982, and are therefore irrelevant to determining when the layer of coverage afforded by each unsettled policy is reached in the vertical allocation for the year that policy was in force.[12] Thus, the problem posited by the non-settling insurers, while it might actually be presented in some future case, is illusory here.[13]

---

**12.** This point is demonstrated by a hypothetical the New Jersey Supreme Court posed to illustrate how vertical allocation within a policy year operates: "Assume that primary coverage for one year was $100,000, first-level excess insurance totaled $200,000, and second-level excess coverage was $450,000. If the loss allocated to that specific year was $325,000, the primary insurer would pay $100,000, the first-level excess policy would be responsible for $200,000, and the second-level excess policy would pay $25,000" (*Carter-Wallace*, 154 NJ at 326-327, 712 A2d at 1124). Given that the primary and lower-level excess insurers have settled with Foster Wheeler, New Jersey apparently requires (subject to the particular terms of each unsettled policy) that, in determining when the nonsettling insurers' layers of coverage are reached, each nonsettling insurer receive a credit for the full amount of the loss allocable to the underlying settled policies (*see Chemical Leaman Tank Lines, Inc. v Aetna Cas. & Sur. Co.*, 177 F3d 210, 227-228 [3d Cir 1999] [applying New Jersey law]; *UMC/Stamford, Inc. v Allianz Underwriters Ins. Co.*, 276 NJ Super 52, 68-69, 647 A2d 182, 190-191 [Law Div 1994]; *see also Carpenter Tech. Corp. v Admiral Ins. Co.*, 172 NJ 504, 517-518, 522, 800 A2d 54, 61-62, 64 [2002] [discussing with apparent approval the *Chemical Leaman* and *UMC/Stamford* holdings on this issue]).

**13.** It is also irrelevant to the determination of the nonsettling insurers' coverage obligations that the putative allocation of the loss to years prior to 1962 that will result from using New Jersey's time-plus-limits method will be different from the allocation that would have resulted under New York's time-on-the-risk method, which presumably would have applied to the settled and lost policies that were in force during those years. To reiterate, since all pre-1962 policies have been settled, this appeal simply does not require us to consider how a loss should be allocated when there must be a determination of the respective coverage obligations of various implicated policies that are governed by the laws of different states mandating the use of conflicting allocation methods. That difficult problem will have to be addressed in a case that actually presents it.

The nonsettling insurers further argue that, even if the foregoing analysis is correct as applied to settled and lost policies in general, certain settled policies—many of which were issued prior to 1962—continue to be at issue insofar as Foster Wheeler, as assignee of the carriers that issued those policies, asserts those carriers' contribution claims (if any) against the nonsettling insurers in this action.[14] The theory of the contribution claims is that the original holders of the claims (Liberty and the London Insurers) each paid "more than its allocable share" of Foster Wheeler's loss. Therefore, the pleadings in support of the contribution claims assert, the nonsettling insurers are liable to Foster Wheeler, as the assignee of Liberty and the London Insurers, for the amounts "properly allocable" to the nonsettling insurers that have been paid by Liberty and the London Insurers.

In our view, the contribution claims only theoretically place the coverage obligations of Liberty and the London Insurers at issue, and therefore do not affect our conclusion that the settled policies are irrelevant to the choice-of-law determination. Obviously, the nonsettling insurers' liability cannot exceed their own actual coverage obligations. Thus, as a practical matter, Foster Wheeler's assertion of the assigned contribution claims merely forecloses the nonsettling insurers from arguing that their liability should be reduced because Liberty and the London Insurers, in their respective settlements, paid Foster Wheeler more than they actually owed.[15] Moreover, it is undisputed that Liberty and the London Insurers are the only carriers that sold Foster Wheeler relevant coverage prior to the 1962 move to New Jersey. Accordingly, it is also irrelevant to the choice-of-law determination that the nonsettling insurers might ultimately argue for reducing their liability on the ground that other settling carriers, which did not assign their potential contribution

---

**14.** The carriers that assigned their contribution claims to Foster Wheeler as part of their respective settlements are Liberty and plaintiffs Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies (collectively, the London Insurers). Liberty assigned Foster Wheeler any contribution claims Liberty had based on payments made pursuant to the primary policies Liberty sold Foster Wheeler from 1951 to 1971 and from 1975 to 1981. The London Insurers assigned Foster Wheeler any contribution claims they had based on payments made pursuant to the excess policies the London Insurers sold Foster Wheeler from 1951 to 1981.

**15.** Of course, Liberty and the London Insurers presumably did not intend to pay Foster Wheeler more than they owed, but it is possible that they did so, given that many issues (including the choice-of-law issue) were unresolved at the time the settlements were made.

claims, paid Foster Wheeler more than they actually owed under their respective policies.

In closing, we note that the nonsettling insurers fail to articulate any justification under choice-of-law principles for their argument that we should render a blanket choice-of-law determination for hundreds of different insurance policies issued by dozens of different insurers over several decades. Each policy constitutes a separate contractual transaction, and to treat insurance policies issued at various widely separated points in time, over a span of decades, as one undifferentiated aggregate for the purpose of choosing one state's law to govern them all, would do considerable violence to the principle (relied on by the nonsettling insurers themselves at certain points in their argument) that the contacts on which the choice-of-law determination depends should have been known to the parties at the time of contracting (*see* Restatement § 188, Comment *e*, at 580 [a contact "can bear little weight in the choice of the applicable law when . . . at the time of contracting it is either uncertain or unknown"]).[16] While there may nonetheless be sound practical reasons to adopt the practice suggested by the nonsettling insurers where the issue cannot be avoided, we find that the settlement of all pre-1962 policies in the case before us obviates any need for us to consider doing so here.

Accordingly, the order of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered January 10, 2005, which denied defendant-appellant Foster Wheeler Corporation's motion for partial summary judgment declaring that New Jersey substantive law governs all disputed issues in this action, and granted the motions by defendants-respondents for partial summary judgment declaring that New York substantive law governs all disputed issues in this action, should be reversed, on the law, without costs, the motion by Foster Wheeler Corporation granted to the extent of declaring that the liability insurance policies issued by defendants-respondents, and the underlying settled policies providing primary and lower-level excess coverage for the same years, are governed by New Jersey substantive law, and the motions by defendants-respondents denied.

---

**16.** In this case, at the various times the unsettled policies were issued between 1970 and 1981, the parties presumably could not have known with any degree of certainty that the unsettled policies would be implicated by claims originating as far back as 1940, or that, by virtue of such claims, the policies issued in those remote times would be relevant to determining the law governing the unsettled policies.

SULLIVAN, NARDELLI, WILLIAMS and SWEENY, JJ., concur.

Order, Supreme Court, New York County, entered January 10, 2005, reversed, on the law, without costs, defendant Foster Wheeler Corporation's motion for partial summary judgment granted to the extent of declaring that the liability insurance policies issued by defendants-respondents, and the underlying settled policies providing primary and lower-level excess coverage for the same years, are governed by New Jersey substantive law, and defendants-respondents' motions for partial summary judgment denied.