14-1346-cv(L)
Fireman's Fund Ins. Co. et al. v. Great Am. Ins. Co. et al.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2014

Nos. 14-1346-cv(L)

FIREMAN'S FUND INSURANCE COMPANY, ONE BEACON INSURANCE COMPANY, NATIONAL LIABILITY AND FIRE INSURANCE COMPANY, QBE MARINE & ENERGY SYNDICATE 1036,

*Plaintiffs – Counterclaim-Defendants – Appellants*,

*v.*

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,

*Defendant – Crossclaim-Defendant –*
*Counter-Claimant – Appellee*,

MAX SPECIALTY INSURANCE COMPANY,

*Defendant – Crossclaim-Defendant –*
*Counter-Claimant – Appellee*,

*v.*

SIGNAL INTERNATIONAL, LLC,

*Defendant – Crossclaim-Defendant –*
*Cross-Claimant*.[*]

---

[*] The Clerk of the Court is directed to amend the official caption to conform to the above. Signal International, LLC is no longer a party to the appeal.

Appeals from the United States District Court
for the Southern District of New York.
No. 10-cv-1653 — J. Paul Oetken, *Judge*.

---

ARGUED: JUNE 24, 2015
DECIDED: MAY 20, 2016

---

Before: CABRANES, POOLER, and DRONEY, *Circuit Judges*.

---

Fireman's Fund Insurance Company ("Fireman's Fund") and Signal International, LLC ("Signal") appealed from judgments of the United States District Court for the Southern District of New York (Oetken, *J.*), granting summary judgment to Great American Insurance Company of New York ("Great American") and Max Specialty Insurance Company ("MSI"). Fireman's Fund, Great American, and MSI underwrote insurance policies that included coverage for a dry dock that Signal owned. After the dry dock sank, Signal and Fireman's Fund sought contribution for losses and cleanup costs from Great American and MSI. Fireman's Fund initiated this action to resolve disputes regarding coverage.

The district court held that the Great American and MSI policies were void because (1) Great American's pollution insurance policy was a marine insurance contract subject to the doctrine of *uberrimae fidei*, and Signal's failure to disclose that the dry dock had deteriorated and that repairs recommended over several years had not been made violated its duty of utmost good faith under that doctrine, and (2) Signal materially misrepresented the dry dock's condition when it applied for coverage from MSI. We **AFFIRM**.

JOHN A.V. NICOLETTI (Robert A. Novak, William M. Fennell, *on the brief*), Nicoletti Hornig & Sweeney, New York, NY, for *Plaintiffs-Appellants*.

GEORGE R. ZACHARKOW (Stephen J. Galati, Christian T. Johnson, *on the brief*), Mattioni, Ltd., Philadelphia, PA, *for Defendant-Appellee Great American Insurance Company of New York*.

STEPHEN D. STRAUS, Traub Lieberman Straus & Shrewsberry LLP, Hawthorne, NY, *for Defendant-Appellee Max Specialty Insurance Company*.

DRONEY, *Circuit Judge*:

Plaintiffs-Appellants are Fireman's Fund Insurance Company, One Beacon Insurance Company, National Liability and Fire Insurance Company, and QBE Marine & Energy Syndicate 1036 (collectively "Fireman's Fund"), insurance companies that provided marine general liability and marine excess liability policies to Defendant–Appellant Signal International, LLC ("Signal").[1]

---

[1] Fireman's Fund Insurance Company and One Beacon Insurance Company each agreed to cover fifty percent of the total amount insured under the marine general liability policy. Fireman's Fund Insurance Company and National

Fireman's Fund and Signal appealed from a judgment of the United States District Court for the Southern District of New York (Oetken, *J.*), granting summary judgment to Defendants-Appellees Great American Insurance Company of New York ("Great American") and Max Specialty Insurance Company ("MSI").

Fireman's Fund, Great American, and MSI issued insurance policies that provided various coverages for a dry dock in Port Arthur, Texas owned by Signal. After the dry dock sank in 2009, Signal and Fireman's Fund sought contributions from Great American and MSI for the loss of the dry dock and resulting environmental cleanup costs. The district court ruled in adjudicating a number of summary judgment motions that the Great American and MSI policies were void in light of Signal's failure to

Liability and Fire Insurance Company each agreed to cover thirty-four percent of the total amount insured under the marine excess liability policy, and QBE Marine & Energy Syndicate 1036 agreed to cover the remaining thirty-two percent. The premiums for these two policies were also divided among the respective insurers. In this opinion, we refer to both the marine general liability policy and marine excess liability policy as issued by Fireman's Fund.

disclose when it applied for those policies that the dry dock had significantly deteriorated and that repairs recommended by a number of consultants and engineers over several years had not been made.

After submission of this appeal, MSI and Signal reached a settlement and obtained a dismissal of the case between them. Therefore, Signal no longer appeals the grant of summary judgment to MSI. Nonetheless, Fireman's Fund asserts that it may still pursue appeal of the issues relating to the policy issued to Signal by MSI based on our decision in *Maryland Cas. Co. v. W.R. Grace & Co. See* 218 F.3d 204, 211 (2d Cir. 2000) ("[T]he contract of settlement an insurer enters into with the insured cannot affect the rights of another insurer who is not a party to it. Instead, whatever obligations or rights to contribution may exist between two or more insurers of the same event flow from equitable principles."). Fireman's Fund was granted summary judgment below against MSI

on a contribution claim based on MSI's policy, and we assume without deciding that Fireman's Fund is correct that it may pursue this appeal of the district court's decision finding the MSI policy void, based on Fireman's Fund's interest in the unappealed summary judgment decision on contribution.

We agree with the district court's orders. We hold that the Great American policy was a marine insurance contract subject to the doctrine of *uberrimae fidei* and that Signal's nondisclosure violated its duty under that doctrine, permitting Great American to void the policy. We further hold that MSI's policy was governed by Mississippi law; that, under that law, Signal materially misrepresented the dry dock's condition; and that MSI was entitled to void the policy on that basis. Accordingly, we **AFFIRM**.

# BACKGROUND

## I.   Factual Background

### A.   The Operation and Loss of the Dry Dock

Signal is a marine construction firm involved principally in building and repairing ocean-going structures such as offshore drilling rigs, platforms, and barges. In 2003, Signal purchased six facilities—two in Mississippi and four in Texas—for use in its business of repairing, upgrading, and converting offshore drilling rigs.[2] One of the Texas facilities was a dockyard in Port Arthur, Texas. In acquiring that facility, Signal assumed an existing lease of a dry dock ("the dry dock") located along the Sabine-Neches

---

[2] These rigs included jack-ups, semi-submersibles, and mobile offshore production units. "A *jack-up* is a rig that is towed to a location, where the legs are 'jacked' down to the ocean floor allowing the work area to be raised about 50 feet above the water level." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 3-9, at 169 n.8 (5th ed. 2011). "A *semi-submersible* is a cross between a submersible and a barge . . . [that] is submerged about 50 feet after which special anchors are lowered to complete the mooring of the rig." *Id.* A mobile offshore production unit is "a jackup rig that has been converted to an offshore production platform" and "can be moved and is reusable." Norman J. Hyne, *Dictionary of Petroleum Exploration, Drilling & Production* 327 (2d ed. 2014).

Waterway near the Gulf of Mexico.[3] The dry dock was built in 1944 at the direction of the United States Navy to repair Navy ships. In early 2005, Signal accepted an offer from the lessor to purchase the dry dock, which Signal had been using in its operations since it assumed the lease.

Throughout its lease and ownership of the dry dock, Signal received a number of reports on the dry dock's deteriorated condition. These included the following:

- The Heger Reports: The dry dock engineering firm Heger Dry Dock, Inc. ("Heger") of Holliston, Massachusetts, periodically inspected the dry dock between 2002 and 2009. In 2002, Freide Goldman Offshore—the operator of the dry dock before Signal—asked Heger to inspect the dry dock in order to provide an estimate of its fair market value.[4] In a December

---

[3] A dry dock is a large structure used to lift ships and other ocean-going vessels out of water for repairs and construction. The dry dock is lowered into the water by flooding its pontoons with water, and then, after an object is loaded onto the dry dock, it is raised by pumping water out of the pontoons.

[4] Although the 2002 Heger Report was created before Signal assumed the dry dock lease, Freide Goldman Offshore's President of Texas Operations, John Haley—who became Signal's Senior Vice President of Texas Operations when Signal acquired the Port Arthur dockyard—received a copy of the report in December 2002, and Haley shared this report with other employees at Signal by (at the latest) January 2005.

2002 appraisal, Heger described "the dry dock [as being] . . . in fair to good condition, with the exception of the pontoon deck . . . , which [was] in poor condition and should be replaced, and section H, which showed markedly more corrosion internally . . . ."[5] J.A. 4215. Heger estimated that the dry dock would have "10 years of remaining useful life if the pontoon deck [was] completely repaired," but the costs of making these "extensive repairs" in the United States rendered the dry dock's value "below zero."[6] J.A. 4215, 4216. In a series of subsequent reports from 2007 through 2009 commissioned by Signal to assist it in prolonging the existing life of the dry dock, Heger found that the dry dock had continued to deteriorate and that long-term repairs had not been made. Instead, Signal had simply patched damaged areas with "doublers."[7] J.A. 688. Heger provided recommendations for extensive repairs that would be required for the dry dock to continue to operate safely. However, Heger repeatedly advised that "the expected life extension for

---

[5] The dry dock consisted of eight pontoons designated "A" through "H."

[6] Alternatively, assuming that the dry dock was transported for repairs abroad, Heger estimated that the dry dock's fair market value would be approximately $800,000.

[7] "Doublers," or doubler plates, are steel plates that "offer a temporary solution for steel plate damage" on marine structures. Ibrahim A. Assakkaf, *Reliability Design of Doubler Plates for Sea Tankers*, *in* Advances in Civil Engineering and Building Materials 823, 823 (Shuenn-Yih Chang et al. eds. 2013). The plates provide "an inexpensive method of repairing corroded plating, cracked plates, or defective welds." *Id.* Doubler plates are "added [on] top of [a] defective area and welded around the plate's perimeter." *Id.* "This temporary repair method [is intended to] maintain structural integrity until . . . permanent repairs [are] made to the original corroded structure." *Id.*

the dock . . . [would] only be a few years" and therefore "the cost, time and effort to perform this work [was] not economically justifiable." J.A. 689. Heger also provided Signal with plans for converting the dry dock to a seven-pontoon configuration (by removing Pontoon H) but warned that "the dry dock structure . . . should be satisfactorily restored before using the dock or proceeding with any modifications." J.A. 4513-14.

- The ABS Audits: Auditor ABS Consulting ("ABS") of Houston, Texas, a maritime risk management firm, was designated by the Port of Port Arthur to review and report on Signal's maintenance and repair programs at the dry dock. In 2003, ABS observed "the rapidly increasing rate of overall deterioration" of the dry dock, which was "largely due to the drydock's age . . . , and . . . lack of adequate maintenance and/or repair." J.A. 4166. ABS noted that, although it had notified the dry dock's owners and operators in January 2000 of the "advanced state of . . . deterioration," they had "made no apparent efforts" to implement ABS's recommended repairs. J.A. 4168. Instead, "more than a hundred doubler plates ha[d] been welded over severely wasted/holed . . . platings." J.A. 4167. Six months later, ABS reported that Pontoon H was "leaking severely," and Pontoons E and G were "leaking significantly" as well. J.A. 4161. ABS concluded that "it appeared that unsafe drydock operations were being conducted" and recommended that "additional drydockings [not be conducted] until substantial hull repairs [were] made to 'H' pontoon and the repairs [were] verified." J.A. 4162 (emphases omitted).

- Internal Staff Study: In April 2003, Signal conducted an internal "staff study" to determine whether to purchase the

leased dry dock from the Port Commission of Port Arthur. The study found that, "without major renewal costs," the dry dock's remaining useful life was "only 3 to 5 years." J.A. 4188. The study concluded that it would cost $21.88 million to extend the life of the dry dock's pontoons "for maybe 10 to 15 years." J.A. 4186-87. The study ultimately advised against purchasing the dry dock in light of its "relatively short remaining useful life and extreme costs of renewal/life extension." J.A. 4188.

- The DLS Surveys: The marine appraiser, surveyor, and consulting firm Dufour, Laskay & Strouse, Inc. ("DLS") of Houston, Louisiana, and Florida was hired to inspect and appraise Signal's Texas and Mississippi facilities "for the purpose of asset allocation and financial review" by GE Commercial Finance, Signal's financing company. J.A. 526. Between 2005 and 2007, DLS observed that the dry dock "had significant water in most compartments . . . [that] require[d] pumping and trimming every four hours," which was "indicative of some wastage holes in the bottom." J.A. 551, 4437; *see also* J.A. 5314. Each year, DLS noted that "[t]he deck plating . . . ha[d] significant doubler plates where plating ha[d] either wasted or separated from internal framing" and that "there was . . . a 12' long tear in the plating extending along a transverse frame" that "reportedly . . . w[ould] be fitted with a proper doubler in the near future." J.A. 551, 4437, 5314. In 2007, DLS concluded that the dry dock was in "fair to good condition" but recommended that its pontoons be dry-docked and repaired "[a]s soon as practical within the succeeding eighteen months . . . to render [it] in good stable operating condition and provide a life extension." J.A. 4437.

- <u>The 2009 Heller Property Risk Assessment Report</u>: Stephen Heller & Associates Inc. ("Heller") of Houston—a loss prevention consulting firm—was hired by Signal in 2008 to conduct a risk review of Signal's Mississippi and Texas facilities in order to "assist [insurance] underwriters in evaluating the exposures, operations, and loss prevention" for those facilities. J.A. 2267. In a January 2009 report, Heller rated the Mississippi and Texas facilities "[o]verall" as "Above Average," meaning that they met "[a]cceptable standards including some industry best practices." J.A. 2270. Heller found that "[t]he maximum foreseeable loss (MFL) or worst case scenario for these facilities [included] a sinking or structural collapse of [the] dry dock at . . . Port Arthur." J.A. 2269. The maximum foreseeable loss was described as "one of extremely low probability and frequency based on previous industry experience." J.A. 2298-99.

Signal never replaced the dry dock's pontoons or pontoon decks. Instead, Signal continued to use inserts and doublers to patch holes in the decks.

In 2009, Signal decided to implement the seven-pontoon configuration by removing Pontoon H. On August 20, 2009, it attempted to remove that pontoon, but during that procedure the entire dry dock sank.

Shortly after the sinking, Signal notified the Texas General Land Office ("GLO"), which regulates pollution affecting Texas shoreline waters, about what had occurred. In September 2009, the GLO advised Signal to "initiate immediate action to recover the . . . dry dock from Texas coastal waters."[8] J.A. 3516. In June 2010, Signal hired Weeks Marine, Inc., to manage removal of the sunken dry dock and cleanup of the site. Removal and cleanup efforts were not completed until March 2012 and resulted in $12,395,026 in costs.

**B.     The Insurance Policies Covering the Dry Dock**

Signal had obtained five insurance policies that insured against risks related to the dry dock at the time of its sinking: (1) a marine general liability policy issued by Fireman's Fund; (2) a marine excess liability policy issued by Fireman's Fund; (3) a pollution policy issued by Great American (the "Pollution Policy");

---

[8] The dry dock contained substantial amounts of asbestos and related contaminants.

(4) a primary property insurance policy ( the "PPI Policy") issued by Westchester Surplus Lines Insurance Company ("Westchester"); and (5) an excess property insurance policy issued by MSI, which provided coverage in excess of the PPI Policy (the "EPI Policy"). Only the Great American Pollution Policy and the MSI EPI Policy are at issue here.

Great American first underwrote the Pollution Policy in 2004 and renewed it annually through 2009. To obtain the renewal of the policy for 2009, Signal completed and submitted Great American's standard "Vessel Pollution Liability Application" along with a "Schedule of Vessels," which included the dry dock and approximately twenty-five tugboats and barges owned by Signal. The Pollution Policy insured Signal against losses of up to $5 million for each property in the Schedule resulting from pollution discharges into navigable waters. The policy specifically insured against claims under the "Oil Pollution Act of 1990, . . . 33 U.S.C.

[§] 2701 *et seq.*" ("OPA"), the "Comprehensive Environmental Response, Compensation[,] and Liability Act, 42 U.S.C. [§] 9601, *et seq.*" ("CERCLA"), and the "Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. [§] 1321, *et seq.*" ("FWPCA"), and the costs of "on-water removal of materials of a non-OPA and non-CERCLA nature which has been mandated by an authorized public authority and [was] the result of a defined single, sudden and accidental event." J.A. 737. An endorsement to the policy also extended coverage to "all Vessels while under repair, alteration, construction, conversion or rebuilding" within 100 miles of the Port Arthur dockyard. J.A. 738.

MSI underwrote the EPI Policy in January 2009. To apply for the policy, Signal submitted its "2009-2010 Property Insurance Submission." This document included a "Statement of Values" that described the dry dock's value as $13.6 million and the 2009 Heller Report, but it did not include other information—such as the Heger

reports, the ABS audits, or the DLS surveys—suggesting that the dry dock was in need of repair. The EPI Policy insured against loss of or damage to properties listed in the Statement of Values, as well as business interruption costs and "[e]xtra [e]xpense[s]" associated with the loss of those properties. The policy provided $15 million coverage for losses in excess of the underlying PPI Policy, which covered losses up to $10 million.

### C. Post-Loss Insurance Claims

In January 2010, Westchester paid Signal its total coverage amount of $10 million pursuant to the PPI Policy for losses related to the dry dock. MSI paid Signal $3.6 million of its total coverage amount of $15 million under the EPI Policy based on the $13.6 million value of the dry dock, as represented in the Statement of Values. Great American refused to make any payments under its Pollution Policy.

In meetings between Signal and its insurers in early 2010, MSI and Great American argued that their policies did not cover the

costs of removing the dry dock from the Sabine-Neches Waterway and cleaning up the site. Fireman's Fund agreed to fund Signal's removal and cleanup efforts but reserved its right to seek reimbursement later from MSI and Great American.

## II. Procedural Background

On March 2, 2010, Fireman's Fund commenced this action against Signal, Great American, and MSI, seeking a declaration as to the obligations of Signal and its insurers for losses associated with the sinking of the dry dock. MSI asserted cross-claims against Signal for the $3.6 million it had paid, and also sought to void the EPI Policy on the ground of misrepresentation after discovery revealed the various reports on the dry dock's poor condition that Signal had not provided to MSI when applying for the policy. Signal cross-claimed against MSI for cleanup and removal costs and additional damages. Great American filed claims against Signal and Fireman's Fund, seeking a declaration that the Pollution Policy was void under

-17-

the maritime doctrine of *uberrimae fidei*, which imposes a duty of utmost good faith on the insured,[9] or alternatively under the policy's "Misrepresentation" clause.[10]

On October 15, 2010, Signal assigned to Fireman's Fund its rights under the Great American Pollution Policy, and Fireman's Fund continued to pursue coverage against Great American. Both Signal and Fireman's Fund maintained their claims against MSI; Signal opposed MSI's efforts to obtain from Signal the $3.6 million it had already paid, and both Signal and Fireman's Fund sought additional payments from MSI under its EPI Policy.

This appeal arises out of eight motions that were filed after the close of discovery. Fireman's Fund, Signal, Great American, and

---

[9] The doctrine of *uberrimae fidei* is discussed in more depth later in this opinion.

[10] The Pollution Policy's "Misrepresentation" clause provides that "[a]ny concealment or misrepresentation by [the insured] of any material fact . . . will void this policy completely . . . , whether such concealment or misrepresentation is deliberate, negligent, inadvertent, innocent, or otherwise." J.A. 727.

MSI moved or cross-moved on the coverage issues for the Pollution Policy and EPI Policy.[11]

On March 25, 2013, the district court granted partial summary judgment, holding that under the EPI Policy, MSI was required to contribute to the payments that Fireman's Fund had made to Signal. *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, No. 10 Civ. 1653 (JPO), 2013 WL 1195277, at *8-9 (S.D.N.Y. Mar. 25, 2013). However, on March 31, 2014, the district court ruled—also on summary judgment—that the Great American Pollution Policy and the MSI EPI Policy were void *ab initio* because of Signal's failure to disclose the dry dock's deteriorated state. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 10 F. Supp. 3d 460, 466 (S.D.N.Y. 2014). The court concluded that the Great American Pollution Policy

[11] Fireman's Fund and Signal jointly moved for summary judgment against Great American, and Great American cross-moved for summary judgment against them, on Great American's cross-claims and counterclaims. Fireman's Fund also moved for summary judgment, and Great American cross-moved for summary judgment, as to whether cleanup and removal costs were covered by the Pollution Policy. Signal moved for partial summary judgment against MSI, seeking a declaration that the EPI Policy was not void. MSI cross-moved for summary judgment against Signal on the same issue.

was a marine insurance contract subject to the doctrine of *uberrimae fidei* and that Signal had breached its duty of utmost good faith to Great American by withholding material information about the dry dock's condition when it applied for coverage. *See id.* 476-93. The district court also held that the EPI Policy was void under Mississippi law because Signal had materially misrepresented the dry dock's condition in its 2009-2010 Property Insurance Submission. *Id.* at 494-503. The court therefore denied Fireman's Fund's and Signal's motions for summary judgment and partial summary judgment, granted MSI's and Great American's motions for summary judgment declaring the policies void, and denied the remaining motions, including MSI's motion for reconsideration of the March 25, 2013 decision on contribution. *Id.* at 493 & n.19, 503-04 & n.25. Fireman's Fund and Signal appealed.

After submission of this appeal, MSI and Signal reached a settlement and obtained dismissal of the case between them. We

still must address the validity of the EPI policy, however, because, notwithstanding the recent settlement between Fireman's Fund and Signal, the EPI policy is still the basis for Fireman's Fund's claim for contribution against MSI.

## DISCUSSION[12]

### I. Great American's Pollution Policy

Fireman's Fund argues that Great American's Pollution Policy is not subject to the doctrine of *uberrimae fidei*. It further argues that,

---

[12] A district court's grant of summary judgment is reviewed *de novo*. *See Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79 (2d Cir. 2009). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In making this determination, the Court "must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)). Where "parties file[] cross-motions for summary judgment[,] . . . each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

even if the doctrine applies, Signal did not breach its duty to Great American because it provided all information that Great American requested about the dry dock on its insurance application.

### A. Admiralty Jurisdiction and the Doctrine of *Uberrimae Fidei*

Great American argues—and the district court concluded—that the Pollution Policy is void under the maritime doctrine of *uberrimae fidei*. For the doctrine to apply, Fireman's Fund's suit against Great American "must . . . be sustainable under the [court's] admiralty jurisdiction." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (emphasis omitted). This is because federal courts' "authority to make decisional law for the interpretation of maritime contracts stems from the Constitution's grant of admiralty jurisdiction to federal courts." *Id.*; *see* U.S. Const. art. III, § 2, cl. 1 (providing that the federal judicial power "shall extend . . . to all Cases of admiralty and maritime Jurisdiction"). Thus, "the grant of admiralty jurisdiction and the power to make admiralty law are mutually

dependent." *Kirby*, 543 U.S. at 23.

"Title 28 U.S.C. § 1333(1) grants federal district courts the power to entertain '[a]ny civil case of admiralty or maritime jurisdiction.'" *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 199 (2d Cir. 1992). "[T]his grant includes jurisdiction 'over all contracts which relate to the navigation, business, or commerce of the sea.'" *Id.* (ellipsis omitted) (quoting *DeLovio v. Boit*, 7 F. Cas. 418, 444 (C.C.D. Mass. 1815)).

"[T]here are few 'clean lines between maritime and non-maritime contracts.'" *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005) (quoting *Kirby*, 543 U.S. at 23). "The boundaries of admiralty jurisdiction over contracts are conceptual rather than spatial, and defined by the purpose of the jurisdictional grant—to protect maritime commerce." *Id.* (citations omitted). "[W]hether a contract is a maritime one . . . 'depends upon the nature and character of the contract,' and the true criterion

-23-

is whether it has 'reference to maritime service or maritime transactions.'" *Kirby*, 543 U.S. at 23-24 (ellipsis omitted) (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). Our inquiry focuses on "whether the principal objective of a contract is maritime commerce." *Id.* at 25. "Therefore, the contract's subject matter must be our focal point." *Folksamerica*, 413 F.3d at 312.

"[A]dmiralty jurisdiction will exist over an insurance contract where the primary or principal objective of the contract is the establishment of 'policies of marine insurance.'" *Id.* at 315 (quoting *Ins. Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 35 (1870)). "[W]hether an insurance policy is marine insurance depends on 'whether the insurer assumes risks which are marine risks.'" *Id.* at 316 (quoting *Jeffcott v. Aetna Ins. Co.*, 129 F.2d 582, 584 (2d Cir. 1942)). "[A]n insurance policy's predominant purpose, as measured by the dimensions of the contingency insured against and the risk

-24-

assumed, determines the nature of the insurance." *Id.* at 317 (quoting *Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 603 (1st Cir. 1997)). Thus, "[u]ltimately, coverage determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the insurance contract and the nature of the business insured." *Id.*

The question of whether an insurance contract is subject to the court's admiralty jurisdiction "ha[s] implications beyond conferring federal jurisdiction." *Id.* at 310. In particular, "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Kirby*, 543 U.S. at 22-23.

Under federal law, a marine insurance contract is subject to "the federal maritime doctrine of *uberrimae fide*, or utmost good faith." *Folksamerica*, 413 F.3d at 310; *see also Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986) ("[T]he substantive law governing marine insurance . . . . [includes the] well-established [principle that] under the doctrine of *uberrimae fidei* . . . the parties to a marine

insurance policy must accord each other the highest degree of good faith.").  The doctrine is a recognition that "the [insured] is more likely to be aware of . . . information" that "materially affects the risk being insured," *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 123 (2d Cir. 2001), and that "[o]ften the insurer lacks the practicable means to verify the accuracy or sufficiency of facts provided by the insured for purposes of establishing the contractual terms," 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 19-14, at 404-05 (5th ed. 2011).  For example, the vessel to be insured may be at some great distance on the high seas, impossible to inspect at the time the application for insurance is filed.  *See* Warren J. Marwedel & Stephanie A. Espinoza, *Dagger, Shield, or Double-Edged Sword?: The Reciprocal Nature of the Doctrine of* Uberrimae Fidei, 83 Tul. L. Rev. 1163, 1168-69 (2009).

Accordingly, under the doctrine, "the party seeking insurance is required to disclose all circumstances known to it which

materially affect the risk." *Folksamerica*, 413 F.3d at 311 (quoting *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd. (In re Balfour MacLaine Int'l Ltd.)*, 85 F.3d 68, 80 (2d Cir. 1996)); *see also Knight*, 804 F.2d at 13 ("Since the [insured] is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire."). "If [the insured] acquires material information after having applied for insurance, he is required to communicate that information to the proposed insurer" as well. *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985). Thus, "[t]he [insured] is bound, although no inquiry be made, to disclose every fact within his knowledge that is material to the risk." 2 Schoenbaum, *supra*, § 19-14, at 405-06. "The standard for disclosure is an objective one, that is, whether a reasonable person in the [insured's] position would know that the particular fact is material." *Knight*, 804 F.2d at 13.

"Failure by the [insured] to disclose all available information

will allow the insurer to avoid the policy," regardless of "whether such omission is intentional or results from mistake, accident, forgetfulness, or inadvertence."[13]  2 Schoenbaum, *supra*, § 19-14, at 406; *see Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510 (1883) ("The concealment, whether intentional or inadvertent, . . . avoids the policy . . . . In respect to the duty of disclosing all material facts, . . . [t]he obligation . . . is one *uberrimae fidei*. The duty of communication, indeed, is independent of the intention, and is violated by the fact of concealment even where there is no design to deceive."); *Puritan Ins. Co.*, 779 F.2d at 870-71; *see also Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.*,

---

[13]  The district court concluded that, under *uberrimae fidei*, the Pollution Policy was void *ab initio*, "meaning that there was never an enforceable contract to begin with." *Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.*, 778 F.3d 69, 83 n.19 (1st Cir. 2015).  However, we agree with the First Circuit that, "as the Supreme Court has described it, . . . *uberrimae fidei* renders a marine insurance contract *voidable*—the contract is deemed valid until being voided at the election of the insurer." *Id.* (emphasis in original); *see Stipcich v. Metro. Life Ins. Co.*, 277 U.S. 311, 316 (1928) (noting that, for insurance policies subject to the doctrine of *uberrimae fidei*, "a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option").  As Great American seeks a declaration that the Pollution Policy is void, the distinction makes no practical difference here.

778 F.3d 69, 83 (1st Cir. 2015) ("Under *uberrimae fidei,* when the marine insured fails to disclose to the marine insurer *all* circumstances known to it and unknown to the insurer which 'materially affect the insurer's risk,' the insurer may void the marine insurance policy at its option." (emphasis in original) (quoting *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 55 (1st Cir. 1995))). However, "[t]he principle of *uberrimae fidei* does not require the voiding of the contract unless the undisclosed facts were material and relied upon." *Puritan*, 779 F.2d at 871.

**B.    The Pollution Policy is a Marine Insurance Contract**

**1.    The "Threshold Inquiry":
The Maritime Nature of the Dispute**

In determining whether a contractual dispute falls within our admiralty jurisdiction, "[s]everal of our cases . . . [have] require[d] that, prior to inquiring into the subject matter of the contract, we first make a 'threshold inquiry' into the subject matter of the *dispute*." *Folksamerica*, 413 F.3d at 312. Those cases hold that "a

-29-

federal court must initially determine whether the *subject matter of the dispute* is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." *Id.* (quoting *Balfour*, 968 F.2d at 200).

"[S]ome uncertainty [exists] as to the extent to which this Court's 'threshold inquiry' test survives the Supreme Court's . . . decision [in *Kirby*] . . . . [where,] [f]ocusing on the contract subject matter, the [*Kirby*] Court found admiralty jurisdiction." *Id.* at 313. "[T]he absence of any discussion by the Supreme Court [in *Kirby*] of a 'threshold inquiry' akin to that found in our precedents is notable."[14] *Id.* at 314.

---

[14] "The Supreme Court introduced [*Kirby*] as 'a maritime case about a train wreck.'" *Folksamerica*, 413 F.3d at 313 (quoting *Kirby*, 543 U.S. at 18). "That decision involved a contract for the transportation of goods from Australia to Alabama." *Id.* (citation omitted). "The dispute concerned a railroad's liability for machinery damaged during a train derailment. The machinery had been transported by ship from . . . Australia, to Savannah, Georgia, and was en route from Savannah to Huntsville, Alabama, when the train derailed." *Id.* (citation omitted). "The Court focused entirely on the underlying contract . . . . [in] f[inding] admiralty jurisdiction." *Id.*

However, we need not resolve that uncertainty here. Assuming the continued vitality of the "threshold inquiry" into the subject matter of the dispute, this case survives it. The dispute over the Pollution Policy concerns insurance coverage for the costs of removing the dry dock and the pollutants it produced upon sinking in navigable waters. The sinking of the dry dock created potential dangers to public health and safety and the environment—matters that would directly impact those who conducted maritime commerce in those waters.

Moreover, the parties' dispute here concerns information provided to an insurer for pollution coverage for a structure used in vessel repair and maintenance. These questions directly implicate the business of maritime commerce. *See Folksamerica*, 413 F.3d at 313 ("The business of ship maintenance has long been recognized as maritime . . . ."); *id.* at 321 (**"**Pollution coverage is widely recognized as marine in nature."); *cf. Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d

34, 36 (2d Cir. 1994) ("There are few objects—perhaps none—more essentially related to maritime commerce than vessels.").

Thus, "the insurance claim [here] . . . has more than a 'speculative and attenuated' connection with maritime commerce." *Folksamerica*, 413 F.3d at 313 (quoting *Balfour*, 968 F.2d at 200). Assuming that the threshold inquiry survives *Kirby*, the dispute here is sufficiently maritime in nature to withstand that inquiry.

### 2.    The Maritime Nature of the Pollution Policy

Our next inquiry is whether the Pollution Policy itself is sufficiently "marine" to warrant application of federal maritime law, including the doctrine of *uberrimae fidei*.

Fireman's Fund urges us to consider only the policy's coverage of the dry dock in determining whether the contract is marine insurance. It maintains that such a "fixed structure drydock" is not a vessel, and thus pollution coverage for the dry dock is not subject to maritime jurisdiction. Fireman's Fund Br. at 17. Fireman's Fund argues that this coverage is severable from the

policy's coverage of other structures and vessels, as evidenced by the fact that each object listed in the policy's Schedule of Vessels is subject to a separate premium.

Prior to *Kirby*, this Court had held that admiralty jurisdiction was limited to "contracts, claims, and services [that were] *purely* maritime." *Folksamerica*, 413 F.3d at 314 (quoting *Rea v. The Eclipse*, 135 U.S. 599, 608 (1890)). "A 'mixed' contract, i.e., a contract that contain[ed] both admiralty and non-admiralty obligations [was], therefore, usually not within admiralty jurisdiction." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997). "[T]he general rule that 'mixed' contracts f[e]ll outside admiralty jurisdiction" was subject to two exceptions: (1) cases where the "claim [arose] from a breach of maritime obligations that [were] severable from the non-maritime obligations of the contract" ("the severability exception"), and (2) cases "where the non-maritime elements of a contract [were] merely incidental to the

maritime ones" ("the incidental exception"). *Folksamerica*, 413 F.3d at 314 (citations and internal quotation marks omitted).

After *Kirby*, however, we "amended our jurisprudence on maritime contracts." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008). We held that "[i]n applying what we have previously called the 'incidental' exception, we should focus 'on whether the principal objective of a contract is maritime commerce,' rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely incidental' to the contract." *Folksamerica*, 413 F.3d at 315 (citation omitted) (quoting *Kirby*, 543 U.S. at 25).

We have not yet addressed the impact of *Kirby* on the severability exception.[15] The Ninth Circuit has held that the exception "collapses in the wake of the [*Kirby*] Court's conceptually-based 'primary objective' test." *Sentry Select Ins. Co. v. Royal Ins. Co.*

---

[15] In *Folksamerica*, the plaintiff did not assert that the severability exception applied. *See Folksamerica*, 413 F.3d at 314.

*of Am.*, 481 F.3d 1208, 1218 (9th Cir. 2007).  We need not to resolve the issue here, however.  Assuming *arguendo* that the Pollution Policy is severable and that its coverage of the dry dock should be viewed in isolation, we nonetheless find that the policy is a maritime contract.

To reach this conclusion, we consider whether "the primary or principal objective of the [Pollution Policy's dry dock coverage] is the establishment of policies of marine insurance," which "depends on whether the insurer assumes risks which are marine risks." *Folksamerica*, 413 F.3d at 315, 316 (citations and internal quotation marks omitted).  This requires consideration of "the terms of the insurance contract and the nature of the business insured."  *Id.* at 317.

As it pertains to the dry dock, the Pollution Policy insures against liability for "accidental discharge or substantial threat of a discharge" from the dry dock "into the navigable waters of the

United States." J.A. 724. Coverage includes liability arising under the OPA[16] and the FWPCA,[17] statutes that hold parties responsible for the release of pollutants into navigable waters. *See* 33 U.S.C. §§ 1321(b)(3), 2702(a). It also extends to "the on-water removal of materials . . . [as] mandated by an authorized public authority." J.A. 737.

In addition to emissions from the dry dock itself, the policy insures against liability for emissions from "all Vessels while under repair" within "a 100 nautical mile radius" of the Port Arthur dockyard. J.A. 738. Thus, the policy provides coverage for vessels located at the dry dock in connection with Signal's repair business—

---

[16] The OPA holds parties that are responsible for "a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines" liable for "removal costs and damages." 33 U.S.C. § 2702(a).

[17] The provision of the FWPCA cited in the Great American Pollution Policy prohibits "[t]he discharge of oil or hazardous substances . . . into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . in such quantities as may be harmful." 33 U.S.C. § 1321(b)(3).

the type of business which has "long been recognized as maritime."[18] *Folksamerica*, 413 F.3d at 313. There is no indication that coverage for vessels located at the dry dock was obtained through the payment of separate premiums. Rather, coverage for such vessels is an extension of the policy's coverage of the dry dock. *See Sirius*, 16 F.3d at 37 (noting that the existence of "separately calculated premiums" is relevant in determining severability of insurance contract provisions). We therefore cannot agree with Fireman's Fund that the policy's provisions related to the dry dock "did not provide coverage for any potential liabilities associated with the actual repair or maintenance of vessels."[19] Fireman's Fund

---

[18] Fireman's Fund argues that Signal's dry dock operations should be considered non-maritime because, in 2009, sixty percent of Signal's revenue came from ship construction, a non-maritime activity. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) ("[A] contract to repair or to insure a ship is maritime, but a contract to build a ship is not." (citations omitted)). However, Christopher Scott Cunningham, Signal's Chief Financial Officer, testified that Signal's construction projects took place at sites other than Port Arthur, and Fireman's Fund has cited no evidence to the contrary.

[19] We are also not persuaded by Fireman's Fund's argument that the Pollution Policy is not marine insurance because the dry dock bore no relation to a vessel

-37-

Br. 20.

We conclude that the primary object of the Pollution Policy's coverage of the dry dock was to insure against the risk of liability for pollutants emitted during Signal's ship repair and maintenance operations there. Insurance policies protecting against such risks have long been considered marine in nature. *See Folksamerica*, 413 F.3d at 321 (finding pollution coverage provisions to be marine, given that "[p]ollution coverage is widely recognized as marine in nature," marine insurance contracts often include pollution coverage, and "[t]he insured's business operations in oil and cargo transportation render[ed] pollution coverage potentially significant"); *see also Certain Underwriters at Lloyds v. Inlet Fisheries Inc.*, 518 F.3d 645, 654 (9th Cir. 2008) ("One type of insurance

or to maritime commerce. *Kirby* makes clear that the involvement of a vessel (or lack thereof) is not dispositive in determining whether a contract is marine. *See Kirby*, 543 U.S. at 23 ("To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case."). Moreover, given its use in repairing and maintaining vessels, the dry dock itself bore a significant relationship to vessels and to maritime commerce.

typifying marine insurance is protection and indemnity ('P & I') insurance . . . . P & I insurance historically included pollution liability . . . . Vessel pollution policies mirror P & I policies in their general terms, but cover liability under the OPA and other environmental statutes. That vessel pollution insurance covers new statutory liabilities . . . does not alter the fact that the risks of incurring that liability stem from the same vagaries of marine life that have shaped maritime insurance law for centuries." (citation omitted)). We hold that the Pollution Policy is a marine insurance policy, subject to our admiralty jurisdiction and federal maritime law, including the doctrine of *uberrimae fidei*.[20]

---

[20] We also conclude that the Great American Pollution Policy is not so "inherently local" as to require the application of state law. *Kirby*, 543 U.S. at 22-23 (citing *Kossick*, 365 U.S. at 735). This analysis asks "whether . . . the application of state law would . . . disturb the uniformity of maritime law." *Kossick*, 365 U.S. at 738. The Supreme Court has recognized that in contract cases, which implicate parties' voluntary agreements, local interests are generally minimized. *See id.* at 741. Moreover, application of state law here would disturb the uniformity of maritime law by upsetting parties' expectations that marine insurance policies are subject to the doctrine of *uberrimae fidei*. This expectation has significant implications for how both insurers and insureds negotiate such policies and conduct themselves for the duration of those policies. *Cf.* Jeremy A. Herschaft,

-39-

## C. Signal Violated Its Duty of Utmost Good Faith by Failing To Disclose the Dry Dock's Condition

We turn next to the questions of whether Signal violated its duty of utmost good faith under the doctrine of *uberrimae fidei* and whether this breach permits Great American to void the Pollution Policy. Under the doctrine, Signal was "bound, although no inquiry be made, to disclose every fact within [its] knowledge that [was] material to the risk [insured against]." 2 Schoenbaum, *supra*, § 19-14, at 405-06; *see Puritan*, 779 F.2d at 870.

---

*Not Your Average Coffee Shop: Lloyd's of London—A Twenty-First-Century Primer on the History, Structure, and Future of the Backbone of Marine Insurance*, 29 Tul. Mar. L.J. 169, 180-81 (2005). The doctrine provides insurers with assurances that the party in the best position to provide information material to the risk—the insured—will bear the burden of providing such information. *See Tradeline*, 266 F.3d at 123 ("*Uberrimae fidae* . . . requires an [insured] to disclose any information that materially affects the risk being insured, because the [insured] is more likely to be aware of such information."); 2 Schoenbaum, *supra*, § 19-14, at 404-05 ("Often the insurer lacks the practicable means to verify the accuracy or sufficiency of facts provided by the insured for purposes of establishing the contractual terms."). The interest in uniform application of the doctrine is especially strong given that marine insurance policies, like the Great American Pollution Policy, frequently provide coverage for properties located in various states and throughout the world. *See Kirby*, 543 U.S. at 29 ("Confusion and inefficiency will inevitably result if more than one body of law governs a given contract's meaning."). Because here "state interests cannot be accommodated without defeating a federal interest [in the uniformity of maritime law], . . . federal substantive law should govern." *Id.* at 27.

-40-

We have held that the doctrine "does not require the voiding of the contract unless the undisclosed facts were material and relied upon." *Puritan*, 779 F.2d at 871. While both parties acknowledge the materiality requirement, they disagree as to whether reliance is an independent requirement and whether that requirement should apply here. Great American notes that reliance has not been widely discussed in this Circuit since *Puritan*. It also contends that, to the extent reliance may be required in some circumstances, it should not be required here, because this case involves a "complete non-disclosure," as opposed to a partial, misleading disclosure. 14-1346-cv Dkt. No. 264.

Citing our decision in *Puritan*, the Eighth Circuit recently held that materiality and reliance are "distinct elements," both of which must be proven for the doctrine to apply. *See St. Paul Fire & Marine Ins. Co. v. Abhe & Svoboda, Inc.*, 798 F.3d 715, 720-22 (8th Cir. 2015). "[M]ateriality examines whether a fact would have influenced the

judgment of a *reasonable and prudent* underwriter," *id.*, in deciding whether "to insure at all or at a particular premium," *Tradeline*, 266 F.3d at 123; *see also Sun Mut. Ins. Co.*, 107 U.S. at 509-10 (holding that nondisclosure permitted avoidance of the contract where, "[h]ad [the undisclosed information] been known, it [was] reasonable to believe that a prudent underwriter would not have accepted the proposal as made"). Reliance, however—according to the Eighth Circuit—requires "a causal connection between the misrepresentation or concealment of that material fact and the *actual* underwriter's decision to issue the policy." *St. Paul Fire*, 798 F.3d at 722; *see Puritan*, 779 F.2d at 871 ("[A] marine insurance policy 'cannot be voided for misrepresentation where the alleged misrepresentation was not relied upon and did not in any way mislead the insurer.'" (quoting *Rose & Lucy, Inc. v. Resolute Ins. Co.*, 249 F. Supp. 991, 992 (D. Mass. 1965))).

We need not decide here whether subjective reliance is required in all cases in order for the doctrine to apply. Even assuming that it is, we find that Signal breached its duty to Great American and that no genuine disputes of fact exist as to either the materiality of Signal's non-disclosures or Great American's reliance.

In applying for the 2009-2010 Pollution Policy, Signal's insurance broker submitted only Great American's standard "Vessel Pollution Liability Application" along with a "Schedule of Vessels," which listed the dry dock. It appears that the only information in those materials related to the dry dock's condition was that it was built in 1945, that it was constructed from steel, and that its gross tonnage was less than 27,000 tons; neither Signal nor Fireman's Fund has argued otherwise. Signal did not provide any surveys to Great American when it applied for coverage for the dry dock.

Notwithstanding the paucity of relevant information furnished by Signal to Great American, it is undisputed that by 2009

Signal had in its possession numerous surveys and reports concluding that the dry dock had substantially deteriorated and that necessary long-term repairs were not being made. At least one survey estimated that the dry dock's value was "below zero." J.A. 4216. Signal's own internal documents and communications with the Heger engineering firm demonstrate its awareness of these concerns. Nevertheless, Signal did not disclose this information to Great American.

This undisclosed information was clearly material—that is, it "would have influenced the judgment of a reasonable and prudent underwriter." *St. Paul Fire*, 798 F.3d at 722 (emphasis omitted). That multiple engineers and Signal's own internal staff study described considerable deterioration of the dry dock and Signal's failure to make recommended repairs over several years was precisely the type of information that would have affected a reasonable insurer's decision "to insure [the dry dock] at all or [at least] at a particular

premium." *Tradeline*, 266 F.3d at 123. If disclosed, this information would have raised significant concerns about the likelihood of pollutant emissions from the dry dock. Given the nature and abundance of this information and the high likelihood that it would have impacted coverage, there can be no genuine dispute that "a reasonable person in [Signal's] position would [have] know[n] that [these] particular fact[s] [were] material" and that Signal therefore had a duty to disclose them. *Knight*, 804 F.2d at 13; *see Catlin*, 778 F.3d at 82 ("[A] hull inspector who surveyed the [drydock] testified that he found 'heavy wastage' in the drydock's hull during an . . . inspection. . . . [The insured's] failure to disclose . . . the [drydock's] level of deterioration [when it applied for insurance] . . . [is a] material fact[], the nondisclosure of which violates *uberrimae fidei*.").

There is also no genuine dispute that in "decid[ing] to issue the policy," *St. Paul Fire*, 798 F.3d at 720, the underwriters at Great

American in fact relied upon the absence of this undisclosed information from Signal's application materials. Cindy Stringer, the Great American underwriter who evaluated the Pollution Policy applications from 2005 to 2010,[21] testified at her deposition that, "had I been able to read [the] [undisclosed] surveys, I definitely would have been concerned . . . . If I had known [the dry dock] was in bad shape, and Signal told me they were going to fix it up, . . . more than likely, I would have told them I didn't want to cover that vessel until they completed all the recommendations." J.A. 6440. She further stated that, "[i]f I knew that the wing walls were in poor condition, I definitely [would have] want[ed] to know what was being done about it." J.A. 6445.

Stringer's testimony also established that, in agreeing to underwrite the policy, she was acting on the understanding that

_____

[21] Another underwriter, Charles Dillon, underwrote the original Pollution Policy in 2004. Stringer took over the account when Dillon left Great American in 2005.

Signal was complying with its duty of utmost good faith. She testified as follows:

> If the insured had information that could materially affect our policy, it would be their obligation to furnish us with that information. . . . [F]or example, if you were to read a survey that said that you had a vessel that was about ready to collapse or something like that, that would be something that you should bring to the attention of your broker, who would then bring it to our attention.

J.A. 6443. She also opined that "it would be common sense if you had a vessel that was about ready to collapse or in danger of sinking or something like that, you would definitely want to let somebody know about it," because "if a prudent insured [is] aware of a condition that would put a vessel in jeopardy, . . . they owe the duty to let underwriters know of that condition." J.A. 6444.

Reese Lever, an underwriter who worked with Stringer on the 2009 renewal of the Pollution Policy,[22] similarly testified that, if Signal was "doing repairs on a vessel, . . . if they're major repairs, it's

---

[22] According to Stringer, Lever compiled the renewal and Stringer approved it.

something we'd want to know about," and that "it's common sense you'd want to let your insurers know that you're repairing these vessels." J.A. 6431. Lever explained that, in his view, "it goes back to the duty of utmost good faith. If there are vessels that have problems, the underwriter should be aware of it." J.A. 6431.

Fireman's Fund argues that Signal did not have an obligation to provide the undisclosed information because Great American did not request surveys or additional information about the dry dock's condition as part of its underwriting criteria or application. However, under the doctrine of *uberrimae fidei*, Great American was not obligated to request such information. *See Knight*, 804 F.2d at 13 ("Since the [insured] is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, *rather than wait for the underwriter to inquire*." (emphasis added)). Instead, Great American was entitled make its decision to underwrite the policy based on the information that Signal

provided, secure in the knowledge that Signal was under a duty of utmost good faith that required it to disclose all information material to the risk insured against. *See Tradeline*, 266 F.3d at 123; 2 Schoenbaum, *supra*, § 19-14, at 404-06.

Fireman's Fund also argues that a genuine dispute exists as to whether the undisclosed information was material because Great American agreed to insure another dry dock owned by Signal ("the Bender dry dock") under the Pollution Policy after the Port Arthur dry dock sank, despite receiving a survey that "raised concerns" about the Bender dry dock's condition. J.A. 6019. For several reasons, we are not persuaded. First, although Lever testified that he considered several points in the Bender dry dock survey significant to his underwriting analysis,[23] none of those conditions rose to the level of extensive dilapidation described in the undisclosed reports regarding the Port Arthur dry dock. Moreover,

---

[23] The survey of the Bender dry dock does not appear in the record. The only evidence of its contents is Lever's deposition testimony.

unlike the Bender dry dock, the available information regarding the Port Arthur dry dock's condition was not limited to an isolated survey. Rather, the undisclosed information at issue here consisted of reports by multiple engineers and risk management professionals (and Signal itself) over a period of more than seven years that contained corroborating accounts of extensive dry dock deterioration and Signal's continued failure to make recommended long-term repairs. In light of these significant distinctions, Great American's decision to insure the Bender dry dock does not raise any genuine dispute as to whether the undisclosed information regarding the Port Arthur dry dock was material and relied upon.

We conclude that Signal breached its duty of utmost good faith by failing to disclose information about the dry dock's condition to Great American. Because this information was both material and relied upon, Great American is entitled to void the Pollution Policy. *See Puritan*, 779 F.2d at 871; *see also Catlin*, 778 F.3d

at 83 ("[T]he evidence conclusively shows that [the insured] failed to disclose material information about the [dry dock's] actual value and preexisting deteriorated condition prior to [the insurer] determining whether it would accept the risk. [The insurer] was free, therefore, to void the policy."). We affirm the district court's grant of Great American's motion for summary judgment and its denial of Fireman's Fund and Signal's cross-motions.

**II.     MSI's Excess Property Insurance Policy**

We next consider the EPI Policy issued by MSI. The district court held that the EPI Policy was not a maritime contract, *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, No. 10 Civ. 1653 (JPO), 2013 WL 311084, at *5 (S.D.N.Y. Jan. 25, 2013), a conclusion that is not challenged on appeal.[24] Nevertheless, the court found that the

[24] The district court concluded that the dry dock was not a "vessel" under *Lozman v. City of Riviera Beach*, -- U.S. --, 133 S. Ct. 735 (2013), *see Fireman's Fund*, 2013 WL 311084, at *3-5, and that "the vessel status of the Drydock was relevant [to the question of whether the EPI Policy was a marine insurance contract] because it informed the primary purpose of the PPI and EPI Policies[] and . . . was *dispositive* because the Drydock was 'by far' the largest piece of property

policy was void under Mississippi law for material misrepresentation. *Fireman's Fund*, 10 F. Supp. 3d at 503.

Fireman's Fund argues that the district court erred in holding that the EPI Policy was governed by Mississippi law rather than Texas law. Alternatively, it contends that, even if Mississippi law applies, the court erred in its application of that state law. For the reasons below, we reject both arguments.

---

insured" under those policies, *Fireman's Fund*, 10 F. Supp. 3d at 479. The court did not find the dry dock's status to be similarly dispositive of the question of whether the Great American Pollution Policy was a marine insurance contract. *See id.*

We need not review the district court's conclusion that the EPI Policy was a non-maritime contract. Although MSI originally filed a cross-appeal challenging that conclusion, MSI later moved to withdraw its cross-appeal without prejudice to re-filing if we ordered a remand in the appeals considered here. We granted the motion, and therefore the question of whether the EPI Policy is a maritime contract is not before us.

**A.    Mississippi Law Governs the EPI Policy**

**1.    New York Choice of Law Rules**

"We review the district court's choice of law *de novo.*"  *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).

"A federal court sitting in diversity . . . must apply the choice of law rules of the forum state."  *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).  "Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction."  *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006) (citation omitted).  This is because "[a] basic precept of contract interpretation is that agreements should be construed to effectuate the parties' intent."  *Id.* (citations omitted).

Where a choice of law clause is not dispositive, "[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *In re Allstate Ins. Co. (Stolarz)*,

613 N.E.2d 936, 937 (N.Y. 1993); *see* 28 Glen Banks, *New York Practice Series: New York Contract Law* § 8:4 (2015) ("If the contract has no choice-of-law clause and the laws of different jurisdictions could apply, New York courts may undertake a choice-of-law analysis. The first step in any case presenting a potential choice-of-law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."). If an actual conflict exists, New York applies "[t]he 'center of gravity' or 'grouping of contacts' choice of law theory." *Stolarz*, 613 N.E.2d at 939.

> [A]pplication of the "grouping of contacts" theory to choice-of-law disputes "gives . . . the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation[.]"

*In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 1179 (N.Y. 2011) (quoting *Auten v. Auten*, 124 N.E.2d 99, 102 (N.Y. 1954)). "[B]y stressing the significant contacts, [this analysis] enables the court, not only to reflect the relative interests of the several jurisdictions

involved, but also to give effect to the probable intention of the parties and consideration to 'whether one rule or the other produces the best practical result[.]'" *Auten*, 124 N.E.2d at 102 (citations omitted) (quoting *Swift & Co. v. Bankers Trust Co.*, 19 N.E.2d 992, 995 (N.Y. 1939)).

"Under this approach, the spectrum of significant contacts—rather than a single possibly fortuitous event—may be considered[.]" *Stolarz*, 613 N.E.2d at 939 (citation omitted). "[T]he New York Court of Appeals has endorsed the following factors (identified in the Restatement [(Second) of Conflict of Laws]): 'the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties.'" *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 151-52 (2d Cir. 2008) (quoting *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994)).

"Critical to a sound analysis, however, is selecting the contacts that obtain significance in the particular contract dispute." *Stolarz*, 613 N.E.2d at 939. The New York Appellate Divisions have repeatedly recognized that "'where the insured risk is scattered throughout multiple states, [New York] courts . . . deem the risk to be located principally in one state,' namely, in the state of the *insured's domicile* at the time the policy was issued," and thus have held that "the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk." *Certain Underwriters at Lloyd's v. Foster Wheeler Corp.*, 822 N.Y.S.2d 30, 35, 36 (App. Div. 1st Dep't 2006) (emphasis added) (quoting *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 153 (2d Cir. 2003)), *aff'd*, 876 N.E.2d 500 (N.Y. 2007).[25] These courts have noted that "[t]he state of the

---

[25] *Accord Jimenez v. Monadnock Constr., Inc.*, 970 N.Y.S.2d 577, 580-81 (App. Div. 2d Dep't 2013) ("Where the covered risks are spread over multiple states, 'the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk[.]'" (quoting *Midland*, 947 N.E.2d at 1179)); *FC Bruckner Assocs., L.P. v. Fireman's Fund Ins. Co.*, 944 N.Y.S.2d 84, 85 (App. Div. 1st Dep't 2012) ("[A]s we noted in *Foster Wheeler* with respect to a choice-of-law analysis

insured's domicile is a fact known to the parties at the time of contracting, and . . . application of the law of that state is most likely to conform to their expectations." *Id.* at 34-35.

### 2. Choice of Law Governing the EPI Policy

Fireman's Fund argues that the district court erred by treating "the state of the insured's domicile [as] determinative" of the choice of law analysis, *Fireman's Fund,* 10 F. Supp. 3d at 496, and by alternatively holding that the grouping-of-contacts analysis favors application of Mississippi law over Texas law.[26]

for insurance policies covering multistate risks, '[t]he state of the insured's domicile is a fact known to the parties at the time of contracting, and (in the absence of a contractual choice-of-law provision) application of the law of that state is most likely to conform to their expectations[.]'" (quoting *Foster Wheeler,* 822 N.Y.S.2d at 34-35)); *Liberty Surplus Ins. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 888 N.Y.S.2d 35, 36 (App. Div. 1st Dep't 2009); *Travelers Cas. & Sur. Co. v. Honeywell Int'l, Inc.,* 880 N.Y.S.2d 66, 67 (App. Div. 1st Dep't 2009); *Appalachian Ins. Co. v. Riunione Adriatic Di Sicurata,* 875 N.Y.S.2d 57, 58 (App. Div. 1st Dep't 2009); *cf. Lapolla Indus., Inc. v. Aspen Specialty Ins. Co.,* 566 F. App'x 95, 97 (2d Cir. 2014) (summary order) (citing *Foster Wheeler,* 822 N.Y.S.2d at 34, 37); *Midland,* 947 N.E.2d at 1179.

[26] The district court found that Mississippi law and Texas law are in conflict regarding the circumstances under which a contract may be voided for misrepresentation. *Fireman's Fund,* 10 F. Supp. 3d at 494-95. We agree. *Compare Carroll v. Metro. Ins. & Annuity Co.,* 166 F.3d 802, 805 (5th Cir. 1999) ("Under

As a preliminary matter, we must determine if the district court looked to the wrong "insured" in its choice of law analysis. Signal claimed that its subsidiary, Signal International Texas L.P. ("Signal-Texas"), which is domiciled in Texas, owned and operated the dry dock, so the relevant domicile of the insured is therefore Texas.

However, contrary to this claim, there is no genuine dispute that Signal International, LLC, was the relevant insured under the EPI Policy. Signal's consultant and former Senior Vice President of Texas Operations, John Haley, stated in his affidavit that "Signal International, L.L.C. . . . was the owner and operator of the AFDB-5 Drydock." J.A. 1852. Furthermore, the EPI Policy itself names

Mississippi law, if an applicant for insurance is found to have made a misstatement of material fact in the application, the insurer that issued a policy based on the false application is entitled to void or rescind the policy. . . . Whether the misrepresentation was intentional, negligent, or the result of mistake or oversight is of no consequence."), *with Mayes v. Mass. Mut. Life Ins. Co.*, 608 S.W.2d 612, 616 (Tex. 1980) ("It is now settled law in this state that . . . before [an] insurer may avoid a policy because of the misrepresentation of the insured . . . [the insurer must prove] the intent to deceive on the part of the insured in making [the representation] . . . .").

"Signal International, LLC" as the "Insured[]," with an address in Pascagoula, Mississippi. J.A. 168. Although the PPI Policy identifies "[t]he First Named Insured" as "Signal International, LLC and any owned . . . subsidiary," J.A. 283, the PPI Policy identifies only Signal International, LLC, by name and lists a Mississippi address for the First Named Insured. Both the EPI Policy and the PPI Policy therefore evince the parties' understanding that the insured was Signal International, LLC, which was domiciled in Mississippi.

Moreover, an analysis that would look to a subsidiary of the insured based on the particular loss that triggered coverage would be at odds with New York's choice of law rules. Under New York law, "barring extraordinary circumstances, only one state's law should govern an insurance agreement." *Md. Cas. Co.*, 332 F.3d at 153. New York courts have declined to look to the location of an insured's subsidiaries in determining choice of law, because "applying multiple states' laws to the enforcement of a single

insurance policy 'defies the law as well as the traditional concerns of judicial economy and uniformity.'" *See FC Bruckner Assocs., L.P. v. Fireman's Fund Ins. Co.*, 944 N.Y.S.2d 84, 85-86 (App. Div. 1st Dep't 2012) (ellipses omitted) (quoting *Wausau Bus. Ins. Co. v. Horizon Admin. Servs. LLC*, 803 F. Supp. 2d 209, 216 (E.D.N.Y. 2011)).

We therefore conclude that, in determining what law governs the EPI Policy, the relevant insured is Signal International LLC, and its domicile is Mississippi.[27]

Fireman's Fund argues that the district court erred by treating the insured's domicile as dispositive of the choice of law analysis.

_____

[27] Fireman's Fund claims that Signal was domiciled both in Mississippi—"its principal office" at the time of contracting—and Delaware, "its place of incorporation." Fireman's Fund Br. at 57. However, where "the state of [a corporate insured's] principal place of business [and] the state of its incorporation . . . are not the same state[,] . . . the state of the principal place of business takes precedence over the state of incorporation" for the choice of law analysis. *Foster Wheeler*, 822 N.Y.S.2d at 36; *see Honeywell*, 880 N.Y.S.2d at 67 ("[F]or [choice of law] purposes, a corporate insured's domicile is the state of its principal place of business, not the state of its incorporation." (citations omitted)); *cf. Certain Underwriters at Lloyds of London v. Ill. Nat'l Ins. Co.*, 553 F. App'x 110, 111-12 (2d Cir. 2014) (summary order) (citing *Foster Wheeler* and applying law of the insured's principal place of business; Restatement (Second) of Conflict of Laws § 188 cmt. e (1971) ("At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation . . . .").

To the contrary, though, under New York law, the law of Signal's domicile governs the EPI Policy since the policy covers risks spread across multiple states. *See, e.g.*, *Lapolla*, 566 F. App'x at 97; *Foster Wheeler*, 822 N.Y.S.2d at 34-36; *cf. Midland*, 947 N.E.2d at 1179.

Nevertheless, even if the totality of the relevant contacts is considered, the result is the same. The EPI Policy's "Declarations" page states that "[t]his Insurance policy is issued pursuant to Mississippi law covering surplus lines insurance." J.A. 168. The same page contains information specific to the Signal policy, including the insured, the covered property, and the policy premium.[28] Signal's 2009-2010 Property Insurance Submission also

[28] Fireman's Fund argues that another page of the EPI Policy supports the application of Texas law. The page states that "[t]his insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas Insurance statutes." J.A. 166. "Surplus lines insurance allows a person who seeks to insure a Texas risk but is unable to obtain that insurance from a Texas-licensed insurer to seek the insurance from an insurer who is not licensed in Texas but is an 'eligible' surplus lines insurer." *Strayhorn v. Lexington Ins. Co.*, 128 S.W.3d 772, 775 (Tex. App. 2004) (quoting Tex. Ins. Code Ann. § 981.001), *aff'd*, 209 S.W.3d 83 (Tex. 2006). "A surplus lines insurer is, by definition, not authorized to issue insurance in Texas. [However,] Texas law permits surplus line insurers to provide insurance in Texas

listed Mississippi as the choice of law for the property policies. In addition, in its preliminary claim statement for coverage after the dry dock sank, Signal stated that the EPI Policy was "issued to a Mississippi insured," " delivered to Signal's offices in Mississippi," and "subject to Mississippi law and jurisdiction." J.A. 6462. These documents demonstrate the parties' understanding that Mississippi law would apply to the policy.

The balance of the other choice of law factors does not clearly favor the law of one state over another. The EPI Policy was negotiated in Virginia and New York. Performance of the contract was to take place in Texas and Mississippi, and the value of the assets insured by the EPI Policy was split almost evenly between

if the insurer . . . meets certain requirements" under the Texas Insurance Code. *Chandler Mgmt. Corp. v. First Specialty Ins. Corp.*, 452 S.W.3d 887, 893 (Tex. App. 2014) (citations omitted). The fact that Signal was able to obtain the EPI Policy as surplus lines insurance from MSI in accordance with Texas law does not answer the question of what state's law the parties intended to govern the substance of the policy itself. The designation of Mississippi law on the "Declarations" page of the policy, combined with Signal's designation of Mississippi as the applicable choice of law in its 2009-2010 Property Insurance Submission and preliminary claim statement after the loss of the dry dock, demonstrates that the parties intended Mississippi law to govern the policy.

those two states. Signal is domiciled in Mississippi, and MSI is domiciled in Virginia.

The mere presence of the dry dock in Texas does not give Texas an overriding interest in having its law govern the policy. "[T]his is merely a dispute over who—[the insured or the insurer]— must bear the cost[s]" related to the loss of the dry dock. *Md. Cas. Co.*, 332 F.3d at 155. "[T]he interest [of a state in which a covered item is located] diminishes when the question is not whether someone will or can pay for the cleanup but rather who will pay." *Id.* (internal quotation marks omitted).

Because the parties' understanding and the insured's domicile favor application of Mississippi law, while the other choice of law factors do not favor the law of any one particular state, Mississippi has the "most significant relationship to the transaction and the parties," such that Mississippi law governs the EPI Policy. *Midland*, 947 N.E.2d at 1179 (quoting *Zurich Ins. Co.*, 642 N.E.2d at 1068).

**B.  MSI Was Entitled to Void the EPI Policy under Mississippi Law**

Fireman's Fund next argues that, even if Mississippi law governs the EPI Policy, the district court's grant of summary judgment to MSI was error.  It contends that MSI failed to show that the requirements to void a contract for material misrepresentation were met, or that, at the very least, genuine disputes of fact preclude summary judgment.

**1.  Material Misrepresentation under Mississippi Common Law**

"Under Mississippi law, if an applicant for insurance is found to have made a misstatement of material fact in the application, the insurer that issued a policy based on the false application is entitled to void or rescind the policy."[29]  *Carroll v. Metro. Ins. & Annuity Co.*,

---

[29] Although the district court and several courts applying Mississippi law have concluded that material misrepresentation renders a contract void *ab initio*, *see Fireman's Fund*, 10 F. Supp. 3d at 465, 495; *Republic Fire & Cas. Ins. Co. v. Azlin*, No. 4:10-CV-037-SA-JMV, 2012 WL 4482355, at *6 (N.D. Miss. Sept. 26, 2012); *Dukes v. S.C. Ins. Co.*, 590 F. Supp. 1166, 1169 (S.D. Miss. 1984), *aff'd*, 770 F.2d 545 (5th Cir. 1985), the Mississippi Supreme Court has recently stated that "the longstanding, well-established law of this State renders voidable a policy issued

166 F.3d 802, 805 (5th Cir. 1999). Thus, "[i]n making . . . underwriting decisions, insurers have the right to rely on the information supplied in the application." *Id.* at 805-06. "To establish that, as a matter of law, a material misrepresentation has been made in an insurance application, (1) it must contain answers that are false, incomplete, or misleading, and (2) the false, incomplete, or misleading answers must be material to the risk insured against or contemplated by the policy." *Id.* at 805 (emphasis omitted).

"Whether the misrepresentation was intentional, negligent, or the result of mistake or oversight is of no consequence." *Id.*

> If the applicant for insurance undertakes to make a positive statement of a fact, if it be material to the risk, such fact must be true. It is not sufficient that he believes it true, but it must be so in fact, or the policy will be avoided, provided, always, that the misstatement be about a material matter.

---

as a result of material misrepresentations," *Jones-Smith v. Safeway Ins. Co.*, 174 So. 3d 240, 242 (Miss. 2015). As MSI sought a declaration that the EPI Policy is void, the distinction makes no practical difference here.

*Prudential Ins. Co. of Am. v. Estate of Russell*, 274 So. 2d 113, 116 (Miss. 1973) (emphasis omitted) (quoting *Fid. Mut. Life Ins. Co. v. Miazza*, 46 So. 817, 819 (Miss. 1908)); *see also Miazza*, 46 So. at 819 ("If the misstatement is material, it can make no difference as to whether or not it was made in good faith.").

"A misrepresentation in an insurance application is material if knowledge of the true facts would have influenced a prudent insurer in determining whether to accept the risk." *Carroll*, 166 F.3d at 805. "Stated differently, a fact is material if it might have led a prudent insurer to decline the risk, accept the risk only for an increased premium, or otherwise refuse to issue the exact policy requested by the applicant." *Id.*

### 2. The EPI Policy's Concealment Clause Did Not Require MSI to Prove "Intent to Deceive"

Fireman's Fund argues that, in order to void the EPI Policy, MSI was required to prove that Signal intended to deceive MSI

when it applied for insurance, regardless of whether Mississippi common law would require such intent. We disagree.

The EPI policy's "Concealment, Misrepresentation or Fraud" clause ("the concealment clause") provides that "[t]his Coverage Part is void in any case of fraud by the Insured as it relates to this Coverage Part at any time. It is also void if the named insured or any other insured, at any time, *intentionally* conceal or misrepresent a material fact . . . ." J.A. 172 (emphasis added).

However, although the policy's concealment clause permits the insurer to void the policy where concealment or misrepresentation is intentional, it does not state that this is the *exclusive* ground upon which the contract may be voided. Under Mississippi law, "[w]hether the misrepresentation was intentional, negligent, or the result of mistake or oversight is of no consequence" in determining whether an insurer may void a policy for misrepresentation or concealment. *Carroll*, 166 F.3d at 805. Nothing

in the EPI Policy indicates that the concealment clause was intended to foreclose MSI's right to void a policy for material misrepresentation as provided under Mississippi law, and we decline to read such a limitation into the policy. *Cf. Ivison v. Ivison*, 762 So. 2d 329, 336 (Miss. 2000) ("It is fundamental in contract law that courts cannot make a contract where none exists, nor can they modify, add to, or subtract from the terms of a contract already in existence.").[30] We therefore conclude that MSI was not required to prove that Signal intended to deceive it in order to void the policy.

### 3. MSI Was Not Required To Request "Answers" on an "Application" To Void the Policy for Material Misrepresentation

Fireman's Fund next argues that MSI could not void the EPI Policy on grounds of material misrepresentation because MSI did not demonstrate that Signal made any false or misleading "answers"

---

[30] We note that at least one court applying Mississippi law, when confronted with a concealment clause nearly identical to the clause present here, permitted the insurer to seek to void the insurance policy under alternative theories of material misrepresentation and breach of the concealment clause, while recognizing that the latter required the statements to be "knowingly and willfully made" and the former did not. *See Azlin*, 2012 WL 4482355, at *5-12.

on an insurance "application." *See, e.g.*, *Carroll*, 166 F.3d at 805 ("To establish that . . . a material misrepresentation has been made in an insurance application, . . . it must contain answers that are false, incomplete, or misleading . . . ."). It argues that MSI did not receive any false "answers" from Signal, since it did not require Signal to complete a standard application in order to obtain the policy. Instead, Signal provided a property insurance submission of its own creation (the 2009-2010 Property Insurance Submission), which included the 2009 Heller Report and a "Statement of Values." The Statement of Values described the dry dock's value as $13.6 million, and the Heller Report described the possibility of the dry dock sinking as a "worst case scenario" "of extremely low probability." J.A. 2269, 2298-99. Fireman's Fund claims that Signal had no affirmative duty to provide further information about the dry dock in the absence of a request from MSI.

We are not persuaded by these arguments. While Mississippi

has frequently addressed the doctrine of material misrepresentation in the context of traditional insurance applications, the Mississippi Supreme Court has recognized that the doctrine arises from "a principle of general application"—"the universal rule that any contract induced by misrepresentation or concealment of material facts may be avoided by the party injuriously affected thereby." *Prudential*, 274 So. 2d at 116 (emphasis omitted) (quoting *Miazza*, 46 So. at 819); *cf. Dukes v. S.C. Ins. Co.*, 590 F. Supp. 1166, 1169 (S.D. Miss. 1984) ("[T]he Plaintiff's suit must fail in that the policy of insurance should be declared void *ab initio* [for material misrepresentation under Mississippi law]. This is simply a general principal of contract law which *the special nature of insurance contracts does not alter*." (emphasis added)), *aff'd*, 770 F.2d 545 (5th Cir. 1985). "The omission or concealment of material facts can constitute a misrepresentation, just as can a positive, direct assertion." *Davidson v. Rogers*, 431 So. 2d 483, 484-85 (Miss. 1983).

It would be inconsistent with these principles to hold—as Fireman's Fund suggests—that Signal could not misrepresent the dry dock's condition simply because MSI accepted a submission of Signal's own creation in agreeing to underwrite the policy. Although MSI did not require Signal to complete a standardized application, Signal nonetheless made affirmative representations about the dry dock (by providing MSI with the Statement of Values and the 2009 Heller Report) in order to induce MSI to insure it.[31] When Signal provided this information, it was required to do so in a way that was not misleading, because "[i]n making [its] underwriting decision[], [MSI] ha[d] the right to rely on the information supplied." *Carroll*, 166 F.3d at 805; *see also Golden Rule Ins. Co. v. Hopkins*, 788 F. Supp. 295, 301 (S.D. Miss. 1991) ("[T]he

[31] This case is therefore distinguishable from those cited by Fireman's Fund which hold that, under Mississippi law, an "[insurance] company has no right to rescind [a] policy because there was information, not asked for on the application and *not volunteered* by the applicant, the knowledge of which would have caused the company to refuse to insure." *Mattox v. W. Fid. Ins. Co.*, 694 F. Supp. 210, 216 (N.D. Miss. 1988) (emphasis added). Here, although it was not requested on a standardized application, Signal volunteered information about the dry dock's condition.

'innocent misrepresentation' standard [under Mississippi law] . . . operates to the benefit of the misinformed insurance company."); *cf. Prudential*, 274 So. 2d at 116 ("If the applicant for insurance undertakes to make a positive statement of a fact, if it be material to the risk, such fact must be true." (emphasis omitted) (quoting *Miazza*, 46 So. at 819)).

By providing MSI with the Statement of Values and only the 2009 Heller Report, Signal represented (1) that the dry dock was valued at $13.6 million, (2) that Signal was operating its facilities—including the Port Arthur dockyard—in accordance with "[a]cceptable standards including some industry best practices," J.A. 1318, and (3) that the likelihood of the dry dock sinking was a "worst-case scenario . . . of extremely low probability," J.A. 2298-99. Signal made these representations despite knowing that (1) multiple engineers—and its own employees—had concluded over several years that the dry dock was in poor condition, in need of extensive

and costly repairs, and nearing the end of its useful life, (2) several engineers had concluded that the dry dock was not operating safely and that extensive repairs would be required before Signal could attempt to reconfigure the dry dock to extend its life, and (3) Signal was not undertaking the long-term repairs that these engineers had recommended. By selectively providing only positive information about the dry dock's condition, while failing to disclose the substantial and multiple sources of information in its possession that called these positive reports into question, Signal's representations to MSI amounted to a misrepresentation of the dry dock's condition.[32] *See Davidson*, 431 So. 2d at 484-85. If material, this

---

[32] Fireman's Fund argues that the 2009-2010 Property Insurance Submission was sufficient to put MSI on notice that it should inquire about possible deficiencies in the dry dock's condition. *See Mass. Mut. Life Ins. Co. v. Nicholson*, 775 F. Supp. 954, 960 (N.D. Miss. 1991) ("[T]he insurance company has the right to rely on the information contained in the application, as long as the insurance company did not have 'sufficient indications that would have put a prudent man on notice.'" (citation omitted) (quoting *N.Y. Life Ins. Co. v. Strudel*, 243 F.2d 90, 93 (5th Cir. 1957))). We disagree. Nothing in Signal's submission suggested that the dry dock was dilapidated, that repairs were not being made, or that it was nearing the end of its useful life. The Heller Report's reference to the sinking of the dry

misrepresentation provided a basis for MSI to void the policy under Mississippi law.

### 4. Signal's Misrepresentation Was Material and Induced MSI To Issue the EPI Policy

Fireman's Fund argues that MSI failed to show that any misrepresentation that Signal might have made regarding the dry dock was material or relied upon in MSI's decision to underwrite the EPI Policy. It also argues that, at the very least, there are genuine disputes of fact that should have precluded summary judgment on these issues.

We disagree. The EPI Policy insured against business interference and extra expenses resulting from the loss of specific properties, including the dry dock. Information that the dry dock had been appraised as having a negative value, had been described as dilapidated and nearing the end of its useful life, and had not undergone long-term repairs (despite the recommendations of

dock as a worst case scenario did not put MSI on notice of the need to inquire more fully about its condition before agreeing to underwrite the policy.

-74-

multiple engineers over several years) would be highly relevant to a "prudent insurer['s]" decision to underwrite the policy, since such information—if investigated and discovered to be true—would indicate an increased risk of loss. *See Carroll*, 166 F.3d at 805.

Signal's experience in applying for hull insurance prior to applying for the EPI Policy also demonstrates the materiality of the undisclosed information and Signal's knowledge that it was material. In 2005, Signal's insurance broker, Willis of Alabama, Inc., applied for hull insurance for the dry dock by submitting the 2002 Heger Report to two insurance providers—Fireman's Fund Insurance Company ("FFIC") and Trident Marine ("Trident"). The FFIC underwriter inquired as to what repairs had been made, observing that "[t]he [a]ppraisal [in the 2002 Heger report] reflects an 'Inside the United States' net value of ($1,150,00) less than zero" and that he was "going have a tough time convincing anybody" to provide the requested insurance. J.A. 4251. Trident's underwriter

similarly questioned whether any repairs had been made, noting that, according to the 2002 Heger report, "the pontoon deck of all sections was found to be in poor condition and should be replaced" and "Section H was also in poor condition." J.A. 4253. The underwriter stated that Trident "would need confirmation from the [insured] that this was taken care of before [Trident] could commit to cover [the dry dock]." *Id.* Thus, in both instances, the underwriters considered the 2002 Heger Report's documented concerns about the dry dock significant to their underwriting decisions. Signal's disclosure of the report permitted these insurers—unlike MSI—to undertake a further investigation of the dry dock's condition before agreeing to underwrite the policy and at a particular premium.

We therefore find that there is no genuine dispute that Signal's misrepresentation to MSI—which presented only positive information regarding the dry dock's condition while omitting

contrary information like the 2002 Heger Report—was material. *See Carroll*, 166 F.3d at 805; *cf. King v. Aetna Ins. Co.*, 54 F.2d 253, 254-55 (2d Cir. 1931) ("[The insured's broker] was informed . . . by [another insurer] that he must ascertain what [the insured] paid for the boat, and, when [the broker] reported that [the insured] would not say, he was told by [the other insurer] that [it] would not place the insurance. If this information was material to the [other insurer], [the broker] must have appreciated that it would be equally material to the [insurer that issued the policy].").

There is also no genuine dispute that MSI was, in fact, induced to underwrite the policy based on this misrepresentation. *See Carroll*, 166 F.3d at 805 ("[T]he insurer that issued a policy *based on the false application* is entitled to void or rescind the policy." (emphasis added)); *see also Republic Fire & Cas. Ins. Co. v. Azlin*, No. 4:10-CV-037-SA-JMV, 2012 WL 4482355, at *6 (N.D. Miss. Sept. 26, 2012) ("[M]isstatements of material fact in an application for

insurance provide grounds for declaring a policy *issued in reliance thereon* void ab initio." (emphasis added) (quoting *GuideOne Mut. Ins. Co. v. Rock*, No. 1:06-CV-218-SA-JAD, 2009 WL 1854452, at *2 (N.D. Miss. June 29, 2009))).

James F. Morano, III, the MSI underwriter responsible for the EPI Policy, testified at his deposition that MSI "relied upon the [2009] Heller report," which "gave a favorable overview of the condition of the properties," for information regarding the dry dock's condition. J.A. 3241. He further testified that, if other surveys had "told [him] information that was different from the information that was being provided to [him], [he] would like to see it" when making his underwriting decision. J.A. 3264. In particular, "if [Signal] had surveys to indicate [the dry dock's] deteriorated condition, [or] repairs that ha[d] been done, that would be helpful." *Id.* In a sworn declaration, Morano further stated as follows:

> Had the conflicting information regarding the condition of the drydock been provided to [MSI] before the Policy was issued, I would have either declined to bind coverage, or offered coverage that expressly excluded claims arising out of the drydock, because the full picture regarding the condition of the drydock, as revealed in the many [undisclosed] engineer reports . . . , portrayed a material risk of imminent catastrophic failure.

J.A. 5629. Having reviewed Morano's account and the remainder of the record, we conclude that there is no genuine dispute that Signal's misrepresentation regarding the dry dock in its 2009-2010 Property Insurance Submission induced MSI to underwrite the EPI Policy.

Because there is no genuine dispute that Signal induced MSI to underwrite the EPI Policy by materially misrepresenting the dry dock's condition when it applied for coverage, the district court correctly held that MSI was entitled to void the EPI Policy under Mississippi law. Consequently, Fireman's Fund may not succeed on its claim for equitable contribution against MSI that it was granted on summary judgment below, as the validity of the EPI policy is a

prerequisite to such a claim.

**CONCLUSION**

We hold that Great American's Pollution Policy is a marine insurance contract and that Great American was entitled to void the policy under the doctrine of *uberrimae fidei* due to Signal's failure to disclose material information indicating that the dry dock was in a deteriorated condition and that recommended long-term repairs were not being made. We also hold that MSI was entitled to void the EPI Policy under Mississippi law because Signal materially misrepresented the dry dock's condition when it disclosed to MSI only reports reflecting positively on the dry dock, while failing to disclose numerous other reports indicating that the dry dock was in a dilapidated state and nearing the end of its useful life. Because no genuine disputes of fact exist as to these issues, the district court properly granted Great American's and MSI's motions for summary

judgment. Accordingly, the judgments of the district court are **AFFIRMED**.